Anthony DEATRICK, Appellant
(Defendant Below),

v.

STATE of Indiana, Appellee
(Plaintiff Below).

No. 2–1077A398.

Court of Appeals of Indiana,
Second District.

July 30, 1979.

William B. Bryan, Angola, for appellant.

Theo. L. Sendak, Atty. Gen., Daniel Lee Pflum, Deputy Atty. Gen., Indianapolis, for appellee.

SHIELDS, Judge.

Deatrick was tried by a jury and convicted of Robbery. We reverse for the reason that he was denied a fair trial.

Deatrick's Motion to Correct Errors alleges that Paul Shock, an accomplice, "testified on behalf of the State pursuant to an agreement with, consideration from, influence from . . . the then Prosecuting Attorney, Joseph Lesh." The accompanying affidavit from Paul Shock may be paraphrased as follows:

(1) During a meeting with the Prosecutor, Shock offered his testimony in return for a reduction in the ten-year sentence he was presently serving,[1] as well as reductions in his brother's sentence and Deatrick's. The Prosecutor's response ("I can't make you any deal, but you can see it in my eyes") led him to believe a deal had been reached.

(2) After the trial, the Prosecutor congratulated Shock "for doing a good job." Later, he called and said that, although he would not go along with the suggested deal, he would write a letter to the Parole Board in Shock's behalf. The Prosecutor did, in fact, write such a letter.

Deatrick's trial counsel, by affidavit, stated that he specifically asked if any deal had been made in exchange for Paul Shock's testimony. In response to repeated inquiries, both to the Prosecutor and to Paul Shock in the Prosecutor's presence, he was told that no such deal had been made.

Deatrick's trial counsel stated further that the jury was never informed of "any consideration from the State to Paul Shock for his testimony". Indeed, the record of the trial proceedings reveals that the Prosecutor specifically questioned Paul Shock, on direct examination, "Have I . . . made any promises to you what would happen to you as a result of your testimony here?" To which Shock answered, "No."

At the evidentiary hearing on the Motion to Correct Errors the parties stipulated that former Prosecutor Joseph Lesh, who was then unable to testify, would have testified to the following:

(1) Lesh does not remember Paul Shock suggesting the deal referred to in his affidavit, but "would not be surprised is same were true." Lesh also does not remember the "winking episode" described in Shock's affidavit.

(2) Lesh told Shock *prior* to trial that if Shock would testify against Deatrick he would not object to Shock's parole and would write a letter in favor of parole. Subsequently, Lesh did write a letter to the Parole Board in Shock's behalf.

The evidence regarding the actual crime may be summarized briefly. Shortly after midnight three men with masks took money (approximately $245.00) at gunpoint from a Sunoco station. The station attendant and another witness gave descriptions of the robbers. The station attendant testified that two of the robbers wore denim jackets and the third a field jacket. The description given to the police shortly after the crime occurred, as contained in the police report, states the one who carried a .45 automatic was wearing blue jeans, an army jacket, and a green ski mask; the second, whose height and weight were estimated at 5'8" and 135 lbs., had shoulder-length blond hair and was wearing a blue denim jacket and a nylon mask; the third was wearing an army jacket, dark brown brushed leather boots, and a ski mask. Some time later, at approximately 6:00 A.M., the police stopped

---

1. According to the record of the evidentiary hearing on the Motion to Correct Errors, Paul Shock entered a guilty plea two months before Deatrick's trial. He had already begun serving time on his ten-year sentence before Deatrick's trial.

a vehicle carrying two men who appeared to match this description. Deatrick, who was driving, had shoulder-length hair and was wearing blue jeans and brushed boots. His driver's license showed him at 5'6" and 115 lbs. The passenger was Larry Shock, Paul Shock's brother. Their mother owned the car. In the car the police found three guns, one of which was a .45 automatic, a blue denim jacket, an army jacket, and three masks. One jacket contained $17 and the other jacket contained $129 in paper money. The Shock brothers, testifying for the State, both admitted participation in the robbery and stated that Deatrick was the third robber.

The issue raised by Deatrick's appeal is whether the Prosecuting Attorney suppressed exculpatory evidence so as to deprive him of due process under the rule of *Brady v. Maryland*, (1963) 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215.

The *Brady* rule applies in three quite different situations involving the discovery, after trial, of information which was available to the prosecution. We need only concern ourselves with two of these situations.[2] The first, typified by the *Brady* case itself, involves a pretrial request for specific evidence. *Brady* held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S.Ct. at 1196. Implicit in this requirement of *materiality*, as noted in *United States v. Agurs*, (1976) 427 U.S. 97, 104, 96 S.Ct. 2392, 2398, 49 L.Ed.2d 342, is "a concern that the suppressed evidence might have affected the outcome of the trial."

In the second situation, the prosecution's case includes perjured testimony and the prosecution knew, or should have known, of the perjury.[3] Cases following *Mooney v. Holohan*, (1935) 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791, have held that a conviction thus obtained is fundamentally unfair and must be set aside if "the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury." *Giglio v. United States*, (1972) 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104, quoting from *Napue v. Illinois*, (1959) 360 U.S. 264, 271, 79 S.Ct. 1173, 1178, 3 L.Ed.2d 1217.

The case before us involves both a specific request and perjured testimony. In response to Deatrick's specific request prior to trial, the Prosecutor denied making any promise to Shock. Paul Shock then testified at trial that the Prosecutor did not promise him anything for his testimony. Yet the stipulation introduced at the evidentiary hearing on the Motion to Correct Errors reveals that the Prosecuting Attorney had, in fact, promised to write a letter in Shock's behalf to the Parole Board if Shock would testify for the prosecution.

The State argues that this letter cannot be regarded as consideration because it was not binding on the Parole Board. Formal authority to assure early parole, or the lack thereof, is not controlling, however. In *Napue v. Illinois, supra*, the promised consideration was a recommendation for, and a promise to effectuate, if possible, a reduced sentence. Parole is analogous to a reduced sentence in that it affects the length of time spent in prison. Although the prosecutor has no formal authority with respect to parole or sentencing, any offer to exert his influence by way of a recommendation is a form of benefit and, as such,

---

**2.** The third situation involves the prosecutor's duty to *volunteer* exculpatory information when either no request has been made or there has been merely a general request for exculpatory matter. *See, United States v. Agurs*, (1976) 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342. *Richard v. State*, (1978) Ind., 382 N.E.2d 899 falls within this category.

**3.** Reference to "should have known" in the *Agurs* opinion, although not entirely clear, alludes to the circumstances present in *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104. The *Giglio* Court held that the trial prosecutor "should have known" of the perjury, even though he was without actual knowledge, because another member of the prosecution team knew of facts indicating the perjury.

constitutes an inducement to testify. *People v. Cwikla,* (1979) 46 N.Y.2d 434, 414 N.Y.S.2d 102, 386 N.E.2d 1070. Since the present trial occurred long after the decisions in *Giglio v. United States, supra,* and *Napue v. Illinois, supra,* the State cannot claim that the law in this regard was unclear. *Cf., Gordy v. State,* (1979) Ind., 385 N.E.2d 1145.

The discovery, after trial, of information that might possibly have been useful to the defense does not automatically result in a new trial, however. A finding of materiality is required. In the case of perjured testimony, the conviction must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the fact finder. In a case characterized by a pretrial request for specific information, the test of materiality is whether the suppressed evidence might have affected the outcome of the trial. See, *United States v. Agurs, supra,* 427 U.S. at 103–104, 96 S.Ct. at 2397–2398.

Both situations invoke a high level of appellate scrutiny.[4] Those cases dealing with the knowing use of perjured testimony have applied a strict standard of materiality, according to the *Agurs* majority, ". . . more importantly because they involve a corruption of the truth-seeking function of the trial process." 96 S.Ct. at 2397. As stated in *Mooney v. Holohan, supra,* 294 U.S. at 112, 55 S.Ct. at 342: ". . . a contrivance by a state to procure the conviction and imprisonment of a defendant [by the presentation of testimony known to be perjured] is as inconsistent with the rudimentary demands of justice as is the obtaining of a like result by intimidation."

The judicial process is similarly tainted when the prosecutor ignores a specific request by the defense.[5] In *Brady v. Maryland, supra,* 373 U.S. at 87, 83 S.Ct. at 1196–97, the United States Supreme Court expressly rejected the good faith or bad faith of the prosecutor as the controlling consideration and stated:

> The principle of *Mooney v. Holohan* is not punishment of society for misdeeds of a prosecutor but avoidance of an unfair trial to the accused. Society wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly.

A specific request gives the prosecutor notice of exactly what is desired.[6] Where the defendant has requested specific information, fairness dictates that the prosecutor follow the procedure outlined in *Agurs,* 96 S.Ct. at 2399:

> Although there is, of course, no duty to provide defense counsel with unlimited discovery of everything known by the prosecutor, if the subject matter of such a request is material, or indeed if a substantial basis for claiming materiality exists, it is reasonable to require the prosecutor to respond either by furnishing the information or by submitting the problem to the trial judge.

**4.** Because this case involves both a specific request and the knowing use of perjured testimony, we do not have to determine whether the standard of materiality is the same or different for these situations. Certainly the language used in *Agurs* suggests that the prosecutor has a very strict duty to disclose in the case of a specific and relevant request: "the failure to make any response is seldom, if ever, excusable." 96 S.Ct. at 2399. *See, e. g., Ostrer v. United States,* (2d Cir. 1978) 577 F.2d 782 (same standard of materiality applies in both these situations). *Cf., Richard v. State,* (1978) Ind., 382 N.E.2d 899 (dicta indicating that a "medium level of review" applies in a specific request case).

**5.** On the other hand, the *Agurs* dissent opined that a corruption of the truth-seeking process occurs any time evidence favorable to the defense is withheld: "It may be that, contrary to the Court's insistence, its treatment of perjury cases [and cases involving a specific defense request for information] reflects simply a desire to deter deliberate prosecutorial misconduct." 427 U.S. at 114–122, 96 S.Ct. at 2402–2406.

**6.** If the request is not precise enough to give the prosecutor notice of exactly what the defense desires, it will fall into the category of a general request and the *Agurs* standard will apply, rather than the standard discussed herein.

**502**

The *Agurs* Court thus concluded, "When the prosecutor receives a specific and relevant request, the failure to make any response is seldom, if ever, excusable."

■ In the instant case the State failed to disclose impeachment evidence, *i. e.*, that Paul Shock's testimony may have been induced by the prosecutor's promise to write a favorable letter to his Parole Board. · Although evidence which goes to the crime itself and tends to exculpate the defendant or support his theory of defense is more likely to be material, impeachment evidence may also be materially favorable to the defense. As stated in *Napue v. Illinois, supra*, 360 U.S. at 269, 79 S.Ct. at 1177:

> The principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction, implicit in any concept of ordered liberty, does not cease to apply merely because the false testimony goes only to the credibility of the witness. The jury's estimate of the .truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in. testifying falsely that a defendant's life or liberty may depend.

The importance of such evidence will depend upon the type of impeachment evidence it is, the extent of its impeachment, and the importance of the impeached witness to the State's case. *See, e. g., Birkla v. State*, (1975) 263 Ind. 37, 323 N.E.2d 645, cert. denied (1975) 423 U.S. 853, 96 S.Ct. 99, 46 L.Ed.2d 77. See generally, Comment, 69 J.Crim. Law & Criminology 197 (1978).

The impeachment evidence here relates directly to the truth of Paul Shock's testimony regarding the facts of the case, as distinguished from general evidence of bad reputation, which only impeaches the general veracity of a witness. The fact that Paul Shock received a benefit in return for his testimony is also evidence of a different and more damaging character than the impeachment evidence which was presented at trial.

As to the importance of Paul Shock's testimony and the strength of the evidence supporting Deatrick's conviction, we note that the two witnesses to the robbery were unable to identify the faces of the perpetrators. Indeed, their description of the second robber with shoulder-length blond hair varied considerably from descriptions of Deatrick's appearance at the time he was stopped. According to the two witnesses, the second robber was 5′8″ and weighed 135 lbs. Deatrick's license showed him at 5′6″ and weighing 115 lbs. Also, according to the witnesses, it was the third robber who had on brushed boots, not the second robber with shoulder-length blond hair. But when the police stopped him Deatrick was wearing brushed boots.

The only other prosecution witness who corroborated Paul Shock's testimony was his brother, Larry Shock, and again we find major discrepancies in their testimony. Larry Shock, for example, claimed he did not wear a jacket during the robbery, contrary to all the other testimony adduced at trial. Both Shock brothers stated that Deatrick wore a ski mask. According to the two witnesses, the robber with shoulder-length blond hair had on a nylon mask. The Shock brothers further testified that Deatrick was the main perpetrator and they were merely passive participants. The two witnesses, on the other hand, testified that all three actively participated in the robbery. As to the items found in the car, not only was there a .considerable lapse in time between the time of the robbery and when Deatrick was stopped, but the car belonged to Paul (and Larry) Shock's mother. Finally, it was the Prosecutor who elicited the perjured testimony and then, in closing argument, repeatedly emphasized the sincerity of the Shock brothers, which action further compounded the prejudice to defendant.

■ On these facts, we simply cannot say there is no reasonable likelihood that the suppressed evidence would have affected the jury's verdict. Paul Shock's testimony was intended to reinforce his brother's testimony. Any evidence affecting his credibility would necessarily affect the strength of his brother's testimony as well. *Cf.,*

*Newman v. State,* (1975) 263 Ind. 569, 334 N.E.2d 684 (new trial ordered, even though victim gave essentially the same testimony as the accomplice).

Accordingly, Deatrick's conviction is reversed and a new trial is hereby ordered.

BUCHANAN, C. J., concurs in result.

SULLIVAN, J., concurs.