**Evelyn GIBSON, Appellant (Defendant Below),**

v.

**STATE of Indiana, Appellee (Plaintiff Below).**

**No. 27A02–8611–CR–405.**

Court of Appeals of Indiana, Second District.

Oct. 22, 1987.

Rehearing Denied Jan. 13, 1988.

Nancy L. Broyles, McClure, McClure & Kammen, Indianapolis, for appellant.

Linley E. Pearson, Atty. Gen., Louis E. Ransdell, Deputy Atty. Gen., Office of Atty. Gen., Indianapolis, for appellee.

SHIELDS, Presiding Judge.

Evelyn Gibson (Gibson) appeals her convictions upon three counts of promoting prostitution under Ind.Code Ann. § 35-45-4-4 (Burns 1985). Gibson was convicted on Count I for knowingly or intentionally enticing or compelling another person, under eighteen years of age, to become a prostitute; on Count III for knowingly or intentionally permitting another person to use a residence, over which Gibson had control, for prostitution; and on Count IV for receiving money from a prostitute, without lawful consideration, knowing it was earned in whole or in part from prostitution.

## ISSUES

The issues on appeal are 1) whether Gibson was denied a fair trial when the State violated discovery orders, and 2) whether the evidence is sufficient to support her convictions on Count I and Count IV.

We affirm.

## FACTS

Evelyn Gibson ran a house of prostitution in her home in Muncie, Indiana, in 1984. Gibson employed Tiki Jo Everrett, JoAnn Beaty and Diane Miller as prostitutes, collecting a percentage of their earnings. JoAnn Beaty was sixteen years old at the time she worked for Gibson.

Police officer Steven Stanley visited Gibson's house posing as a customer and obstensibly employed the services of prostitute Tiki Jo Everrett. Stanley paid Everrett, who was at the time assisting police, fifty dollars in marked bills. Everrett gave the marked bills to Gibson, which resulted in Gibson's arrest on October 25, 1984. Trial by jury ensued on June 10, 1985.

Prior to trial, Gibson filed three motions to produce, all of which were granted. All three motions were identical and ordered the State to produce, among other things:

"1. The names and addresses of persons whom the Prosecuting Attorney intends to call as witnesses at the trial, together with their rele-

vant written or recorded statements;

. . . . .

9. Any evidence the Prosecution might have, favorable to this defendant;

. . . . .

16. Any victim's statements...."

Record at 45–46, 49–50, 116–117. Gibson proceeded to trial, believing the State had provided all ordered discovery materials.

At trial the jury returned guilty verdicts on Counts I, III and IV. Gibson's motion to correct errors was denied. After filing her record of proceedings with the Clerk of this court, Gibson learned of the existence of three audio-recorded statements of State's witnesses the prosecution had failed to provide pursuant to the discovery orders. All were interviews conducted prior to trial at the prosecutor's office by the prosecutor and his chief investigating officer. Two were with State's witness JoAnn Beaty, and one with State's witness Diane Miller.

The existence of these statements was revealed during the trial of Howard Burns, which took place after Gibson's trial, and at which both JoAnn Beaty and Diane Miller testified as State's witnesses.[1]

When Gibson learned of the tapes, she was granted permission to file a belated motion to correct errors and allowed to inspect and copy the tapes. At a hearing on her belated motion to correct errors, Gibson introduced transcripts of the tapes and claimed that she had been denied a fair trial because statements on the tapes "differed from trial testimony in many material aspects." Appellant's Brief at 7. The trial court denied Gibson's belated motion to correct errors.

## DISCUSSION

### *Discovery Violation*

■ Gibson argues that she was denied a fair trial when the State wrongfully, through either prosecutorial misconduct or gross negligence, failed to provide the tape recorded statements of State's witnesses despite three specific requests and three court orders. She argues that the prosecution's obligation to disclose was not discretionary but mandated by the Due Process Clause of the U.S. Constitution. She points out that even if the withholding of evidence was merely negligent, rather than deliberate, there are still sufficient grounds for a new trial.

There is little doubt the prosecutor's office deliberately violated the discovery orders. Nevertheless, while such violations are inexcusable and totally reprehensible, a constitutional violation occurs only if the nondisclosure deprives a defendant of a fair trial. *United States v. Bagley* (1985), 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481. The constitutional obligation to provide an accused a fair trial is not measured by the "moral culpability or willfulness of the prosecutor." *United States v. Agurs* (1976), 427 U.S. 97, 110, 96 S.Ct. 2392, 2400, 49 L.Ed.2d 342; *Brady v. Maryland* (1963), 373 U.S. 83, 87; *Mooney v. Holohan* (1935), 294 U.S. 103, 106–107, 55 S.Ct. 340, 79 L.Ed. 791.

The issue is whether the prosecutor's withholding of the taped statements in violation of discovery orders deprived Gibson of a fair trial. Resolution of this issue depends upon the evidential relationship that exists between the suppressed tapes and Gibson's conviction. "[A] constitutional error occurs, and a conviction must be reversed, only if the evidence is material in the sense that its suppression undermines

---

**1.** On appeal, Burns asserted the State's withholding of the tapes denied him a fair trial. He also claimed the trial court abused its discretion by refusing to declare a mistrial or, alternatively, grant him a continuance. This court disagreed. However, on transfer, our supreme court vacated this court's opinion, reversed Burns' conviction, and remanded for a new trial. It held "[b]ecause the trial court applied the work-product privilege to protect prior verbatim statements of a witness who had already testified on direct examination, and because it failed to conduct an *in camera* review of the prior statements to determine the State's claims of paramount necessity and irrelevancy, this is not a matter upon which the trial court's decision resulted from the exercise of its discretion." *Burns v. State* (1987), Ind., 511 N.E.2d 1052, 1054. This case does not, however, involve any such issue or claim.

confidence in the outcome of the trial." *Bagley*, 473 U.S. at 678, 105 S.Ct. at 3381.

## Materiality

Prior to *Bagley*, the Supreme Court applied differing standards of materiality to post-trial discovery of nondisclosed evidence depending upon whether the prosecution used perjured testimony, or failed to disclose evidence favorable to the accused when specifically requested, or whether the nondisclosure occurred when either a general request or no request was made by the defendant. *See United States v. Agurs* (1976), 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342.[2] However, in *Bagley*, the Supreme Court reformulated the standard for cases involving specific requests as well as for those involving general (or no) requests into one, the so-called *Strickland*[3] standard: "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Bagley*, 473 U.S. at 682, 105 S.Ct. at 3384. Thus, although a stricter standard still applies to the prosecution's knowing use of perjured testimony, the *Bagley* standard applies to all other cases when the prosecution fails to disclose evidence favorable to the accused. Accordingly, it is applicable to Gibson's claim.

Gibson contends that the suppressed evidence could have been used for impeachment purposes at trial. The United States Supreme Court has rejected any distinction between impeachment evidence and exculpatory evidence. *Bagley*, 473 U.S. at 676, 105 S.Ct. at 3380. However, the importance of impeachment evidence depends on the facts of the particular case.

In *Deatrick v. State* (1979), 181 Ind.App. 469, 392 N.E.2d 498, this court explained: "[T]he importance of such evidence will depend upon the type of impeachment evidence it is, the extent of its impeachment, and the importance of the impeached witness to the State's case." *Deatrick*, 181 Ind.App. at 475, 392 N.E.2d at 502. Considerations appropriate to this determination include whether the witness' suppressed statement was substantially inconsistent with the witness' trial testimony, whether the suppressed statement would have refuted an element of the offense or whether it would have served only to impeach the general veracity of the witness, whether the witness making the suppressed statement was otherwise impeached, whether the witness' trial testimony regarding elemental facts was corroborated by other witnesses, and whether the defense had access to other pre-trial statements of the witness not claimed to be inconsistent with the suppressed statement.

## Suppressed Statement of Diane Miller

Gibson was charged by Count III with: "... having control over the use of a place, to-wit: 601 South Council Street, Muncie, Delaware County, Indiana, knowingly permit another person, to-wit: Diane Miller, to use the place, said 601 South Council Street, for prostitution," a violation of IC 35–45–4–4(3) (Burns 1985). Diane Miller's testimony as a witness for the State was critical to the State's case on this count. Gibson contends that because there were so many inconsistencies between Miller's trial testimony and her suppressed statement, the unavailability of Miller's statement denied her a fair trial.

We disagree. The trial court properly concluded the nondisclosed evidence is immaterial within the meaning of *Bagley*.

The inconsistencies cited in Gibson's brief between Miller's suppressed statement and her trial testimony concern when she started working for Gibson, how much work she performed, whether she quit or was fired, how she was paid and Gibson's share, the names of her customers, her relationship with her boyfriend, Gibson's

---

2. For an Indiana case applying the *Agurs* standards, see *Deatrick v. State* (1979), 181 Ind.App. 469, 392 N.E.2d 498.

3. *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674.

protection by city officials and Gibson's use of a tape recorder.

The inconsistencies in Miller's suppressed statement did not refute any element of the offense but would have served only to impeach Miller's general veracity as a witness. Many of the cited inconsistencies are either *de minimis* or, in fact, are not inconsistencies. For example, in her suppressed statement Miller said she stated working for Gibson in August while at the trial she testified she commenced in July. In her statement, she claimed having committed 20 to 30 acts of prostitution while at trial she claimed it was "[f]orty at the most," Record at 533, and forty "approximately maybe." Record at 548. These inconsistencies are obviously *de minimis*.

Different names of customers appeared in the suppressed statement than in Miller's trial testimony. However, at neither time was Miller requested to give an exhaustive list of her customers. Obviously, then, she did not contradict herself. Similarly, her suppressed statement that she dated Jeff Carter after working for Gibson is not inconsistent with her trial testimony that she met Jeff at Gibson's house. Finally, Miller, in her suppressed statement, said Gibson said she [Gibson] only tape recorded sessions between politicians and prostitutes. At trial, she said Gibson used microphones to determine whether her prostitutes were cheating on her. These statements are not inconsistent.

There are, however, true inconsistencies. In her suppressed statement Miller said Gibson fired her while at trial Miller said she quit. In her suppressed statement, Miller said Gibson's cut of Miller's earnings was 30%. Her testimony at trial was that Gibson took from 20% to 50%, depending upon her mood and the charge to the customer. Also, in the suppressed statement, Miller said the money was handed by the customers to Gibson most of the time while at trial Miller said she received the money and later divided it with Gibson. Finally, at trial, she testified Gibson said she paid money for protection while in her state-

ment she said Gibson never mentioned protection money.

The trial court's determination that these inconsistencies were negligible in the context of Miller's entire testimony is proper. They do not relate to elements of the offense but concern only her general credibility which was otherwise attacked by her admissions of criminal conduct other than prostitution. During her trial testimony, Miller exhibited memory lapses and her responses to questions were, on occasion, confusing and equivocal.

Finally, Miller consistently maintained she performed acts of prostitution at Gibson's house and that she shared the money from her acts with Gibson. This evidence was corroborated by other witnesses such as Tiki Jo Everrett and Pam Crouch Roberts.

In conclusion, an examination of the entire record convinces this court that the trial court properly concluded the suppressed evidence would not have affected the outcome of the trial.

*Suppressed Statements of JoAnn Beaty*

Gibson was charged by Count I with knowingly or intentionally enticing or compelling JoAnn Beaty, then under the age of eighteen years, to become a prostitute. JoAnn Beaty's testimony for the State was critical to the State's case on this count. As with Miller's statement, Gibson argues her inability to impeach Beaty with her suppressed statements mandates a new trial.

The cited inconsistencies involving Beaty include how Beaty met Julius McIntosh, whether Beaty performed a particular type of act, how many times she worked for Gibson, whether Julius or Chris McIntosh gave her drugs, whether she had sexual relations with Julius after he learned she was sixteen, whether he was a paying customer, whether she needed false identification and Gibson's knowledge of Beaty's age.

Again, many of the alleged inconsistencies in Beaty's suppressed statements are either *de minimis* or are not inconsistencies at all. There is no conflict between

Beaty's averment she was introduced to Julius McIntosh at Gibson's and that Fred Scott introduced her to him. Similarly, it is entirely consistent for Beaty to say she worked for Gibson three or four times and also to say she performed seven acts of prostitution at Gibson's house. Beaty may well have performed more than one act on any single night. Neither is there anything inconsistent between her statement Burns told her he would get her false identification and her statement that Gibson also asked him to obtain the false document. Finally, Gibson's claimed inconsistency relating to Beaty's statement disclaiming a need for false identification in Muncie is not supported by the record.

Beaty did, however, make inconsistent statements concerning whether she performed a certain type of sexual act, whether it was Chris or Julius McIntosh who gave her drugs, whether she did or did not have sexual relations with Julius after he found out she was under age and whether he was a paying customer.

In addition, there is one alleged inconsistency that bears close scrutiny because it relates to the element of the offense that Gibson knew Beaty was under the age of eighteen years.

At trial, Beaty admitted that in her pretrial video-taped statement she had said that Gibson had asked her age and Beaty had told her she was sixteen. Gibson responded that "she'd had younger girls work for her before." Record at 601. Beaty further admitted that in her pretrial video-taped statement she said that Howard Burns was present when she told Gibson she was sixteen and that Gibson had asked Burns, in Beaty's presence, to obtain false identification. Beaty went on to testify that Burns helped her obtain the identification for the purpose of working for Gibson in Florida and that she performed acts of prostitution for money at Gibson's house after Gibson knew Beaty was sixteen. She also admitted she had told the police that Gibson thought she was eighteen, not sixteen.

In Beaty's first suppressed statement she said she obtained the false identification from Howard Burns "[b]ecause he wanted to take me to Florida, him and Gibson did, to work for Gibson." Record at 135A4. She also stated Gibson had introduced her to Burns. Thus, nothing in this first suppressed statement is inconsistent with Beaty's trial testimony.

In Beaty's second suppressed statement she stated that her mother told Burns Beaty was only sixteen. In that same statement, Beaty was asked, "Did Howard Burns then tell Evelyn about you being only sixteen?" John answered, "He didn't while I was there. He said he wouldn't tell her because he said she would get mad." Record at 136A9.

The second suppressed statement reveals Burns did not tell Gibson of Beaty's age while Beaty was there and that he did not intend to do so. However, the fact Burns said he would not tell Gibson her age, and did not do so in Beaty's presence, is not inconsistent with Beaty's testimony at trial that she, in fact, told Gibson her true age in Burns's presence. Thus, Beaty's second suppressed statement also is not inconsistent with her testimony at trial.

We do appreciate the possibility of a conflict in the inferences reasonably supported by the statements. Nevertheless, considering the asserted inconsistent statements, including conflicting inferences pertaining to Gibson's knowledge of Beaty's true age, we agree with the trial court's conclusion there is no reasonable probability the result of the trial would have been different had Beaty's suppressed statements been disclosed. Beaty was a hostile witness for the State. At trial she initially denied ever performing sexual acts for money at Gibson's. She claimed she went to Gibson's house only to work for a modeling agency. Later at trial she admitted that in a pretrial video-taped statement, to which Gibson had access, she said she had worked for Gibson as a prostitute while on drugs. When confronted with her pretrial video-taped statement, Beaty admitted she had previously told the police that Gibson thought she was eighteen. These are examples of the manner in which Beaty substantially impeached herself at trial. In

addition, Gibson had access to numerous materials with which she impeached Beaty including the video-taped pretrial statement, her testimony at the Julius McIntosh trial, and a written statement she had given to a private investigator, Bing Crosby. And, other witnesses contradicted her. At the same time, these witnesses corroborated various aspects of Beaty's testimony including that she worked as a prostitute for Evelyn at a time when Evelyn knew she was sixteen years of age.

In conclusion, as with Miller's statement, the trial court properly concluded there is no reasonable probability the result of the trial would have been different had the suppressed statements been disclosed.

### Sufficiency of the Evidence

■ Gibson contends there is insufficient evidence to prove beyond a reasonable doubt that she knew Beaty was sixteen years of age. Gibson's knowledge of Beaty's age is essential to enhance promoting prostitution to a class B felony as charged in Count I. Gibson's claim is based on testimony Beaty was dishonest about her age and gave conflicting ages to different people at different times. However, Beaty also testified she prostituted for Gibson when she was sixteen and that Gibson knew her age at that time. In essence, Gibson asks us to reweigh Beaty's testimony and judge her credibility. We will not. Considering the evidence most favorable to the State, and reasonable inferences arising therefrom, there is substantial evidence of probative value supporting the verdict on Count I and we affirm.

■ Count IV states that Gibson, on October 25, 1984, did "receive money, to wit: fifty (50) dollars from a prostitute, to wit: Tiki Everrett, without lawful consideration, knowing it was earned in whole or in part from prostitution." Record at 54. Gibson claims that she could not be guilty under Ind.Code Sec. 35–45–4–4(4) (Burns 1985) because an act of prostitution did not occur between Tiki Everrett and the police decoy,

Officer Steven Stanley. Gibson's claim is based on the proposition that she could not have received money knowing it was "earned" from prostitution when there was no prostitution. Thus Gibson concludes there was insufficient evidence to support the jury's verdict on Count IV.

The word "earned" must be read in the context of the phrase "knowing it was earned in whole or in part from prostitution...."[4] Thus Gibson's claim is actually that in order for a person to know of an event, the event must have occurred.

Gibson's claim is philosophically astute, but legally incorrect. A philosophically adequate definition of "knowledge" may indeed exclude the possibility of a person knowing of an event that never occurred. But this lends no support to Gibson's conclusion that she could not be guilty because the relevant sense of "know," in the context of the statute is "a mental state and the trier of fact may examine the circumstances to reasonably infer its existence." *Whorton v. State* (1980), Ind.App., 412 N.E.2d 1219, 1223. Thus, for purposes of promoting prostitution, knowing is a state of mind which can occur even when what is "known" did not occur. In other words whether Tiki Everrett committed an act of prostitution with Officer Stanley is irrelevant to Gibson's conviction on Count IV because the evidence reasonably supports the fact finder's determination Gibson believed an act of prostitution had occurred. Her state of mind, therefore, was one of knowledge.

Judgment affirmed.

GARRARD and BUCHANAN, JJ., concur.

---

4. An act of prostitution encompasses the solicitation or offer to commit sexual acts for hire as well as the actual commission of the acts. *Senst v. State* (1975), 162 Ind.App. 357, 319 N.E.2d 663, 666.