Benjamin **HOUSER**, Appellant–Defendant,

v.

**STATE** of Indiana, Appellee–Plaintiff.

No. 64A04–9506–CR–236.

Court of Appeals of Indiana.

Feb. 19, 1996.

Rehearing Denied March 27, 1996.

Transfer Denied May 29, 1996.

Steven L. Langer, Valparaiso, for Appellant.

Pamela Carter, Attorney General, James D. Dimitri, Deputy Attorney General, Indianapolis, for Appellee.

**OPINION**

CHEZEM, Judge.

*Case Summary*

Defendant–Appellant, Benjamin Houser ("Houser"), appeals from his convictions for Conspiracy to Commit Theft, a class D felony, and Aiding in a Theft, a class D felony. We affirm.

*Issues*

Houser presents four issues for our review, which we restate as:

I.   Whether there was sufficient evidence to sustain his convictions for Conspiracy to Commit Theft and Aiding in a Theft;

II.   Whether the trial court properly denied Houser's motion for a new trial;

III.   Whether certain statements by witness Franco Santarromana ("Franco") were properly admitted; and,

IV.   Whether the trial court correctly instructed the jury regarding "false impression" in relation to the charge of Conspiracy to Commit Theft.

*Facts and Procedural History*

The facts most favorable to the verdicts indicate that during November and December of 1991, Houser was the president of Pyro Industrial Services, Inc. ("Pyro"), a corporation in the business of high-temperature furnace applications.  Also during that time, Franco was a project manager for Correct Maintenance Corporation ("CMC"), an industrial cleaning company.  As a project manager, Franco was responsible for obtaining

business for CMC and supervising those projects he obtained.

John Stanley ("Stanley") was CMC's accounting manager in November and December, 1991. Franco approached Stanley in November, 1991, and stated that CMC was late in paying Pyro for an invoice and that CMC needed to pay Pyro. However, Franco did not have an invoice from Pyro and Stanley told Franco that he needed an invoice from Pyro in order to process a payment. Franco later produced an invoice for $5,000.00 to Stanley, indicating that the invoice was for equipment rented from Pyro. The invoice also indicated that the equipment was rented for a project CMC was working on at Bethlehem Steel, where CMC had been contracted to clean gutters on the roof of a building. Franco was the project manager for the Bethlehem Steel gutter job.

Through November and December of 1991, Stanley received four more Pyro invoices for $5,000.00 each, purportedly for equipment rental. Those invoices also indicated that the rental was for the gutter job at Bethlehem Steel. According to CMC corporate policy, CMC's president, Lex Venditti ("Venditti"), authorized payments for the invoices. CMC issued a $5,000.00 check to Pyro for each invoice. Each check required two signatures because the checks were for an amount of $5,000.00 or more. Both Stanley and Venditti signed the checks in question. ,

In December, 1991, Donovan Boyd became the new president of CMC. Boyd was made aware by CMC employees of their concerns about CMC's business activities with Pyro. Boyd hired a private investigator and, after a preliminary investigation, Boyd contacted police.

Houser was convicted on both counts charged. The trial court entered judgment on both counts as class A misdemeanors. Houser was sentenced to one year at the Porter County Jail on each count, the sentences to run consecutively. The court suspended all but 45 days of the sentences, which time was to be served on community service.

*Discussion and Decision*

**I.**

We must first determine whether there was sufficient evidence to sustain his convictions for Conspiracy to Commit Theft and Aiding in a Theft. Our standard of review for this issue is well-settled. *See, e.g., Tillman v. State*, 642 N.E.2d 221, 223 (Ind.1994); *Beatty v. State*, 567 N.E.2d 1134 (Ind.1991).

■ To be convicted of Aiding in a Theft, the State must have proved that Houser: "knowingly or intentionally aided, induced or caused another person to commit [Theft]." I.C. 35–41–2–4. The State must prove first that the theft was accomplished. *Davis v. State*, 267 Ind. 152, 368 N.E.2d 1149, 1152 (1977).

Houser argues that there was insufficient evidence to prove that the transactions involving the $5,000.00 checks were unauthorized. "[One] who knowingly or intentionally exerts unauthorized control over property of another person, with intent to deprive the other person of any part of its value or use, commits [T]heft." I.C. 35–43–4–2(a). A person's control over the property of another person is unauthorized if it is exerted without the other person's consent, in a manner or to an extent other than that to which the other person has consented, or be creating or confirming a false impression in the other person. I.C. 35–43–4–1(b).

■ There is a great amount of circumstantial evidence which supports the findings of the jury. Circumstantial evidence is sufficient to support a verdict if an inference may be reasonably drawn from the evidence that supports the verdict. *Cardin v. State*, 540 N.E.2d 51, 58 (Ind.Ct.App.1989), *reh. denied, trans. denied*. An examination of the evidence presented to the jury indicates that the jury's verdicts were supported by the evidence.

Donovan Boyd, the president of CMC at the time of trial, testified that it was unusual for checks written for invoices to be written in the amount of an even thousand dollar amount, such as for $5,000.00. The invoices submitted by Pyro to CMC indicate that the equipment allegedly rented by CMC for the Bethlehem Steel gutter job were two air

compressors, four jackhammers, a diamond-bladed masonry saw, a diamond-wheeled side grinder, and miscellaneous hand tools. Ivars Bruks and Mike Niloff, the CMC service engineers responsible for overseeing the gutter job, testified that they did not observe any equipment owned by Pyro at the job site. They also testified that CMC did not use any air compressors during the gutter job because they were able to tap into pre-existing compressed air sources provided by the mill. Additionally, the jackhammers and hand tools used at the site did not belong to Pyro. No diamond-bladed masonry saw or diamond-wheeled side grinder was ever used on the job.

Pyro's warehouse manager, Ronald Kniola, the person responsible for overseeing the materials that were sent off to job sites where Pyro was performing work, testified that he was not aware of Pyro ever renting equipment to other contractors. Kniola also testified that Pyro did not own any air compressors, and that although Pyro owned masonry saws, the saws and other equipment listed on the invoices were never absent from Pyro's warehouse during November and December, 1991. The evidence overwhelmingly suggests that the equipment listed in the invoices provided by Houser was never rented to CMC.

Houser directly assisted Franco in obtaining the invoices and payment of those invoices from CMC. Each time CMC issued a check to Pyro, Franco personally delivered the check to Pyro's offices. Franco first took the check to Pyro's accounts receivable clerk, Teresa Dewitt, to pay for the invoice. Dewitt, at Houser's direction, then prepared and issued a new invoice to Franco for equipment rental. Franco then proceeded to Margo Fornari, Houser's secretary. Houser then instructed Fornari to issue a vendor check to Franco. Fornari finally directed the accounts payable clerk to issue the vendor check to Franco, payable to him, which Houser signed each time. Franco received from Pyro four checks for $4,000.00 and one check for $5,000.00, which he deposited into his own personal checking account. Additionally, Teresa Dewitt testified that during November and December, 1991, Franco went to Pyro's offices to meet with Houser, and that she had directed telephone calls from Franco to Houser during that same time period.

Houser nonetheless maintains that Venditti, as CMC's president, had unlimited authority to consent to the transfer of corporate funds and that CMC, acting through Venditti, did not rely on any false impression in issuing checks to Pyro. However, Stanley testified that the corporate policy was that for checks of $5,000.00 or more, two signatures were needed from CMC to negotiate the check. He also testified that he was unaware when he signed the checks that the equipment would not actually be provided.

■ The issue is whether CMC was deceived by the false invoices. CMC, as a corporation, could only act through its agents, and their acts, when done within the scope of their authority, are attributable to the corporation. *See, Hibschman Pontiac, Inc. v. Batchelor,* 266 Ind. 310, 362 N.E.2d 845, 848 (1977). Stanley, as the accounting manager, was an agent of CMC. At the very least, Stanley, because he had authority to sign the checks and to apprise the company's president as to the check's necessity, had apparent or implied authority to act as an agent on behalf of the company. We do not know that Stanley even had express authority to act on behalf of the company.

Franco brought the invoices to Stanley thinking Stanley could accomplish the ends desired by Franco and Houser, and that was to provide checks in exchange for the invoices. To the extent that Franco and Houser negotiated with Stanley as they would have negotiated with any other agent of CMC, they are estopped from claiming Stanley was merely performing a ministerial function, rather than acting as an agent for CMC. Therefore, the deception of Stanley was a deception of CMC. A false impression was created in CMC when Houser issued the false invoices. Stanley testified that he relied on those misrepresented invoices. Accordingly, there was sufficient evidence to support the jury's finding that Houser aided Franco in the theft of CMC funds.

■ Houser also claims that the evidence was insufficient to support his conviction for Conspiracy to Commit Theft. It was not necessary for the State to prove that the theft had been committed. The elements for the crime of conspiracy are: (1) intent to commit a felony (theft), (2) an agreement with another person to commit the felony, and (3) an overt act in furtherance of that agreement. I.C. 35-41-5-2. A conviction for conspiracy may rest on circumstantial evidence alone. *Mullins v. State*, 523 N.E.2d 419, 424 (Ind.1988). The State is not required to prove the existence of a formal agreement. *Concepcion v. State*, 567 N.E.2d 784, 790 (Ind.1991). Rather, the agreement, as well as the requisite *mens rea*, may be inferred from circumstantial evidence, including overt acts of the parties in pursuance of the criminal act. *Id.*

As previously mentioned, the circumstantial evidence relating to Houser's involvement in the theft is compelling. The overt act in furtherance of the conspiracy was Houser's instruction to prepare and issue invoices to CMC for payment of equipment that Pyro never rented to CMC. The evidence also suggests that during November and December, 1991, Franco and Houser met at Pyro offices and talked on the telephone. The evidence could have led a jury to reasonably infer that Houser was guilty of conspiracy.

## II.

■ We must next determine whether the trial court properly denied Houser's motion for a new trial. Houser claims he was entitled to a new trial because the State withheld, in violation of a discovery order, the name of Janet Cornett ("Cornett"), a former Pyro employee. The State interviewed Cornett in connection with the case but did not call her as a witness. Houser claims Cornett provided the State with exculpatory information and that, had the information been known to counsel, it would have changed defense trial tactics.

■ The State is required to disclose to a criminal defendant, upon request, any material that is exculpatory or affects the credibility of a witness, and is known to the prosecution. *Fadell v. State*, 450 N.E.2d 109, 115 (Ind.Ct.App.1983). "A constitutional error occurs, and a conviction must be reversed, only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial." *Gibson v. State*, 514 N.E.2d 318, 320-21 (Ind.Ct.App. 1987), *reh. denied, trans. denied.* The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *Id.* at 320.

Houser argues that Cornett's testimony would have proved that Venditti had knowledge and approved of the invoices and checks and therefore, that Houser provided the company with no false impression. The relevant question is whether, but for the State's nondisclosure of Cornett's identity to defense counsel, the result of Houser's trial would have been different. The trial court, in denying Houser's motion for a new trial, found that Cornett's testimony would not have added anything material to the case, because her testimony would have been cumulative. We agree.

■ Whether Venditti knew, approved, or participated in Houser's scheme is not relevant to his conviction. Venditti was not CMC; rather, he was merely an agent acting on behalf of CMC. That an agent may have committed wrongdoing against its principal does not imply that a third party who assisted that wrongdoing may escape criminal liability based on a theory of agency. The corporation itself was the victim of the deception, which is enough to sustain a conviction against any person who participated in perpetrating the deception.

Not only was proof of Venditti's knowledge irrelevant, but Houser was not prejudiced by the State's nondisclosure of Cornett because Cornett was not called as a witness by the State. She provided no information during the trial which could have exculpated Houser. Additionally, any information she could have provided would have done nothing to exculpate Houser because Venditti's role was not relevant to Houser's culpability.

## III.

We must next determine whether certain statements by witness Franco were properly admitted. Houser claims that the trial court committed reversible error in admitting the hearsay statement of Franco without first establishing a proper foundation. Hearsay is an out-of-court statement offered to prove the truth of the matter asserted. Ind.Rule Evid. 801(c). Hearsay that does not fall within one of the exceptions to the rule against hearsay is inadmissible. Ind.Rule Evid. 802.

A statement is not hearsay if "the statement is offered against a party and is ... (E) a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy." Ind.Rule Evid. 801(d)(2)(E). In order for a statement of a co-conspirator to fall under the hearsay exception, there must first be independent proof of the existence of the conspiracy. *Mayhew v. State*, 537 N.E.2d 1188, 1190 (Ind. 1989). Generally, only those acts and declarations which transpired or were made between the beginning and ending of the conspiracy and in furtherance of its objectives may be shown against the asserted co-conspirator who did not make the declaration. *Chinn v. State*, 511 N.E.2d 1000, 1002 (Ind. 1987), *reh. denied.*

There was circumstantial evidence of the existence of a conspiracy between Franco and Houser, independent of Franco's statements to Stanley. Dewitt testified that during November and December, 1991, Franco had been at Pyro's offices to meet with Houser. Additionally, Dewitt stated that she had directed phone calls from Franco to Houser during the same time period. There was also evidence that Houser had directed the issuing of the false invoices to CMC and the vendor checks to Franco during that time period.

The statements Franco made to Stanley were in furtherance of the conspiracy with Houser because without the false invoices, he could not have obtained the money from CMC. His representation that the invoices were for equipment rental was also necessary to carry out his scheme because Stanley testified that he would not have processed payments for the invoices had he known that the money would end up in Franco's personal bank account.

The statements by Franco before and during the conspiracy are therefore admissible as an exception to the general prohibition against hearsay.

## IV.

We must finally determine whether the trial court correctly instructed the jury regarding "false impression" in relation to the charge of Conspiracy to Commit Theft. The court gave the following instruction to the jury:

I instruct you that in order for a person to have "created a false impression" in another person, the evidence must show that the alleged victim was deceived. If the prosecution fails to prove that CMC was deceived in the payment of the invoices, no crime has been committed.

Houser argues that the word "payment" was erroneous and that the word "approval" should have been used instead. He bases this position on his view that the primary issue in the case was whether Venditti approved of the invoices.

The manner of instructing the jury lies within the sound discretion of the trial court and will not be disturbed unless an instruction error, when considered with all instructions as a whole and in reference to each other, is such that the charge to the jury misstates the law or otherwise misleads the jury as to the law applicable to the case. *Starks v. State*, 620 N.E.2d 747, 750–51 (Ind. Ct.App.1993).

We discussed previously that Venditti's knowledge or participation is not relevant to Houser's culpability. The facts are that CMC, as a corporation, was deceived by Houser. Additionally, it was the payment, and not the approval of the invoices which led to the crimes charged. Regardless, CMC did not approve of the payments. A false impression was created in CMC when Houser issued false invoices and Stanley relied on those invoices. Accordingly, the jury in-

struction contested by Houser was not erroneous.

Affirmed.

RILEY and DARDEN, JJ., concur.