Kevin **HIGHTOWER**, Appellant–Defendant,

v.

**STATE** of Indiana, Appellee–Plaintiff.

No. 49A05–0603–CR–124.

Court of Appeals of Indiana.

May 17, 2007.

360

Reginald B. Bishop, Roberts & Bishop, Indianapolis, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Michael Gene Worden, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

CRONE, Judge.

### Case Summary

Kevin Hightower appeals his convictions and sentences for corrupt business influence, three counts of theft, conspiracy to commit bribery, and conspiracy to commit forgery.[1] We affirm but remand with instructions.

### Issues

Hightower raises various issues, which we distill and restate as follows:

I. Whether the trial court properly admitted into evidence statements of a co-conspirator;

II. Whether the State presented sufficient evidence to support the convictions for corrupt business influence, theft, conspiracy to commit bribery, and conspiracy to commit forgery;

III. Whether Hightower's sentence is proper considering aggravating circumstances, mitigating circumstances, Indiana Appellate Rule 7(B), and the Sixth Amendment; and

IV. Whether the abstract of judgment requires correction.

### Facts and Procedural History

Hightower formed Tower, LLC ("Tower"), as a provider of employment training. Tr. at 914.[2] As president and chief execu-

tive officer, Hightower was "responsible for the day-to-day operations and vision of the Tower purpose." State's Ex. 46 (response to request for proposal); Tr. at 925 (Hightower testified that he was the "head of Tower."). He wrote or approved "most of the checks," even those for small amounts. Tr. at 712. Hightower also hired employees for Tower, including William Gutierrez, whom he asked to be Tower's vice president.[3] Id. at 688–89.

On May 17, 2002, Hightower and Gutierrez, in their corporate capacities, entered into a one-year "Memorandum of Understanding" ("MOU") between Tower and Results Consulting, Inc. ("Results"). State's Ex. 2. Although originally started in the mid–1990s by James Stiles and another partner, Results conducted no business until Matthew Raibley joined Results in May 2002; at that point, Raibley and Stiles became the sole owners and operators of Results. Tr. at 145, 141, 481. Also at that same time, Raibley was the director of the Indiana Manpower and Comprehensive Training Program ("IMPACT") for the Indiana Family and Social Services Administration ("FSSA"). Id. at 137–39. IMPACT was the employment and training section for families that receive public assistance and had a budget of approximately $50,000,000. Id. Stiles served as the assistant program manager for IMPACT.

The MOU, which was purportedly applicable only to social services contracts *out-*

---

1. Although the court also found Hightower guilty of conspiracy to commit theft, it did not enter judgment or sentence thereon.

2. The date Tower was formed is unclear. *See* Tr. at 914 (Hightower answered, "That is correct[,]" when asked if Tower was incorporated in June 2001), 59; *but see* State's Exh. 46 (application for certification, which lists "6/13/02" as date Tower was established); *cf.* State's Exh. 7 (Tower's response to Request for Proposal 3–6, which states that

Tower "was incorporated in 2000" and was "established to assist individuals with a holistic approach to transition into a working environment conducive to their professional and vocational desire with self-sufficiency."). On appeal, neither party focuses upon this discrepancy.

3. Despite his position as vice president, Gutierrez did not initially have access to Tower's mail. Tr. at 66, 714.

*side* of Indiana,[4] stated as follows:

### I. Purpose

The purpose of this agreement is to form a working relationship between the two companies in order to promote the best interest of each company's interests and integrity. This working relationship will enable each of the parties to better serve their customers and [sic] well as promote joint ventures involving the two companies.

. . .

### III. Scope of the Agreement

Tower, Inc. and Results Consulting, Inc. agree to pursue joint ventures in the business of social service delivery. Tower, Inc. expertise in delivering training and curriculums to customers is acknowledged and Results Consulting, Inc. expertise in providing guidance on funding opportunities, performance based contracting strategies and proposal presentation is acknowledged.

State's Ex. 2. Pursuant to the MOU, Results would be paid $125 per hour to provide Tower with a variety of services, including:

- Identification of possible funding sources and training opportunities

- Locating possible joint cooperative ventures

- Assisting in development of performance based contract proposals

- Providing guidance in proposal presentation and/or perform joint presentations in support of Tower

- Supplying Tower with a "consciousness awareness of social service strategy trends"

- Keeping Tower on the "cutting edge of recent and proposed social service legislation and it[s] possible ramification[s]"

- Providing Tower with a strategy focused approach on assisting agencies in meeting federal participation requirement

*Id.*[5]

Almost immediately thereafter, Tower requested assistance with proposals within Indiana—despite ethical concerns that had led the parties to initially focus on out-of-state opportunities. Tr. at 37, 283. Accordingly, Raibley and Stiles, while on FSSA time, met with Tower employees regarding various projects and billed Tower per the MOU. Hightower commented that he and Gutierrez needed to "treat [Raibley] well"[6] since Raibley "approv[ed] the moneys." *Id.* at 720. Raibley often signed vouchers submitted by Tower, conveyed opportunities to Tower, and assisted with proposals. At one point, Raibley recommended the award of a no-bid contract worth $425,000 to Tower, Results' sole client and only source of income. *Id.* at 242, 192, 238, 269–70, 515, 556.[7] Tower paid Results somewhere between $15,000

---

4. *See* Tr. at 265.

5. After the MOU was signed and Raibley and Stiles had left, Hightower commented to Gutierrez that he would have paid anything to retain them and then stated, "You know, we're in this." Tr. at 69.

6. In the summer of 2002, Tower flew Raibley and Stiles to California, where at some point Hightower and Gutierrez brought them on a boat ride "to show Matt [Raibley] and Jim [Stiles] what it could be like." Tr. at 737.

7. Previously, Hightower had been a subcontractor for Occupational Industry Council ("OIC"), the company that had been awarded the $425,000 contract in the past. Tr. at 144. However, by August 2002, problems had apparently emerged with OIC, and Raibley recommended cutting OIC and awarding the no-bid contract to Tower. *Id.* at 215; *see also* State's Exh. 6.

and $20,000 for its consulting services. *See id.* at 717, 931 ($16,000 or more). Hightower paid with money orders because "Results wasn't supposed to be doing the actual work on the RFP [8] because of a conflict of interest and ethics violation, and he didn't want to put it on record that they performed the work on those specific RFP's, because they were—I believe one of them was to FSSA." *Id.* at 76. Tower "took advantage" of Raibley's position with FSSA in that it had "access." *Id.* at 238.

Gutierrez and Tower employee Julie Mitchell falsified certifications that were sent to FSSA for Tower training programs. *Id.* at 302–03, 324. Specifically, certain information was whited out, and fictitious social security numbers were inserted. *Id.* Again, FSSA, often through Raibley's authorization of vouchers, paid Tower several thousand dollars for various training programs. Although many of these programs were never completed, Hightower failed to convey this information to Raibley or FSSA, thus precluding FSSA from requesting reimbursement for unearned money. *Id.* at 284–85.

In the spring of 2004, Hightower, Gutierrez, Raibley, and Luis Terrazas were indicted and charged with numerous counts of a variety of crimes, including corrupt business influence, conspiracy to commit theft, conspiracy to commit bribery, conspiracy to commit forgery, theft, conspiracy to commit obstruction of justice, and identity deception. Hightower waived his right to trial by jury. Tr. at 49. Although presented with an opportunity to file a brief regarding co-conspirator statements, Hightower did not do so. *Id.* at 130. After amendments and dismissals, on December 19, 2005, a bench trial began on the following ten charges: corrupt busi-

ness influence (I), conspiracy to commit theft (II), three counts of theft (III, IV, V), conspiracy to commit bribery (VI), three counts of identity deception (VII, VIII, IX), and conspiracy to commit forgery (X). App. at 208. At the conclusion of a three-day trial, the court took the matter under advisement, eventually finding Hightower guilty of seven counts: I through VI and X. Tr. at 982–83.[9]

On February 10, 2006, the court effectively vacated the guilty finding upon the conspiracy and sentenced Hightower as follows:

Ct. 1: corrupt business influence, C felony; 4 yrs. total, 2 exe., 2 susp.

Ct. 4: theft; receiving stolen property, D felony; 2 yrs. total, 1 exe., 1 susp.

Ct. 6: theft; receiving stolen property, D felony; 2 yrs. total, 1 exe., 1 susp.

Ct. 8: theft; receiving stolen property, D felony; 2 yrs. total, 1 exe., 1 susp.

Ct. 11: conspiracy to commit bribery, C felony; 4 yrs. total, 2 exe., 2 susp.

Ct. 33: conspiracy to commit forgery, C felony; 4 yrs. total, 2 exe., 2 susp.

*See* Appellant's App. at 35 (abstract of judgment); see also Ind.Code §§ 35–45–6–2, 35–43–4–2, 35–44–1–1, and 35–43–5–2. The court ordered the terms to be served concurrently and specified that Hightower was to serve the first year of the executed sentences in the Department of Correction and the second year in "Community Corrections in Component deemed appropriate by Community Corrections." App. at 35. The court noted regular conditions of probation, added 100 hours of community service work for each year of probation, and ordered restitution, "which is joint and several with that co-defendant, in the amount of $98,000." Tr. at 1046–47.

---

8. "RFP" refers to a request for proposal.

9. Co-defendant Terrazas was found not guilty. Earlier, Raibley and Gutierrez had pled guilty.

We shall supply additional facts where necessary.

## Discussion and Decision

### I. Admission of Co–Conspirator Statements

Hightower asserts that the court committed reversible error when it failed to rule on the admission of co-conspirator evidence during pre-trial hearings. He contends that "[a]llowing co-conspirator statements into the hearing without any knowledge of the nature or content of the statements to be offered violates [his] constitutional rights to confront the witness against him and erodes the effectiveness of counsel." Appellant's Br. at 27–28. In a related argument, Hightower challenges the admission of co-conspirator evidence where "there was no independent evidence of a conspiracy." *Id.* at 29.

▮▮▮ Regarding the co-conspirator statements, the court took them under advisement until they were to be introduced at trial. Pre-trial rulings on admissibility do not "determine the ultimate admissibility of the evidence." *McCarthy v. State,* 749 N.E.2d 528, 537 (Ind.2001). Therefore, even if the court had granted or denied a motion in limine, said ruling would not constitute an appealable issue. *See Simmons v. State,* 760 N.E.2d 1154, 1158 (Ind.Ct.App.2002). Not until evidence is admitted at trial over a specific objection can a party assert an error on appeal. *See Carter v. State,* 754 N.E.2d 877, 881 n. 8 (Ind.2001) (noting that defendant must reassert his objection at trial contemporaneously with the introduction of the evidence to preserve the error for appeal), *cert. denied; see also Helton v. State,* 539 N.E.2d 956, 957 (Ind.1989) (stat-

ing that denial of pre-trial suppression motion is not a final ruling; to preserve error, objection must be made when evidence is introduced at trial). Thus, the question is two-fold: (1) did Hightower specifically object so as to preserve the issue on appeal, and (2) if so, did the court err in admitting certain evidence.

▮▮▮ On appeal, Hightower challenges the admission of State's Exhibit 3, testimony related thereto (Tr. at 159–167), and testimony regarding State's Exhibit 7 (Tr. at 359).[10] State's Exhibit 3 is a hard copy of an e-mail, dated June 19, 2002, from Gutierrez to Raibley and Stiles, with Hightower listed on the "Cc:" line. The "Subject" line reads: "Re: FW: IYI Weekly Update for the Week of June 17." State's Exh. 3. The body provides:

> Matt, thank you for this info. You know us, we'll start work on it. Tower might need some help from Results to respond to this.
>
> Thanks, again,
>
> William

*Id.* The e-mail includes the history, that is, the message to which Gutierrez was replying, which was:

> William and Kevin, Thought you might be interested in this opportunity.
>
> Matt

*Id.* Attached thereto were details about after-school funding programs, scholarships, and grant opportunities within Indiana. *See id.*

When the State began questioning Raibley about the e-mail, counsel for co-defendant Terrazas objected. As the State was addressing the concerns raised by the co-defendant, Hightower's counsel interject-

---

**10.** Hightower does not challenge any other evidentiary admissions; thus, he has waived any issue as to the admission of other evidence. *See Cooper v. State,* 854 N.E.2d 831, 834 n. 1 (Ind.2006) (noting that absent cogent argument or citation to authority, argument is waived).

ed, "Your Honor, I'm going to object. . . . Judge, he's jumping to a conclusion . . . in his argument at this point, Judge, and I'm asking the Court to remove that statement. That's a decision you must make, not Mr.—it doesn't add up to—. . . Well, I'm going to leave it, I'm not going to tread into that water, but I am going to object." Tr. at 164. Lacking any specific ground, this objection was general and therefore preserved nothing for our review. *See, e.g., Moore v. State,* 669 N.E.2d 733, 742 (Ind.1996) ("To preserve a suppression claim a defendant must make a contemporaneous objection that is sufficiently specific to alert the trial judge fully of the legal issue. When a defendant fails to object to the introduction of evidence, makes only a general objection, or objects only on other grounds, the defendant waives the suppression claim.") (citations omitted).

■ Shortly thereafter, Hightower objected again, this time asserting, "We cannot assume that this information was ever received or was in the hands or obtained knowledge to Mr. Hightower." Tr. at 166. That is, at trial, when Hightower objected to State's Exhibit 3 and the testimony concerning that exhibit, he did not allege hearsay or confrontation grounds—the grounds he now asserts. "It is well-settled law in Indiana that a defendant may not argue one ground for objection at trial and then raise new grounds on appeal." *Gill v. State,* 730 N.E.2d 709, 711 (Ind.2000). Having changed his theory for challenging the admissibility of State's Exhibit 3 and the testimony regarding that e-mail, Hightower has waived this claim of error for appellate review. *See id.*

■ State's Exhibit 7, entitled "RFP–3–6," was described as Tower's response to a request for proposals for child welfare services. Tr. at 193 (Raibley's testimony). Upon clarifying that the RFP was never executed, Hightower made no objection at trial (nor does he object on appeal) to the admission of Exhibit 7. *Id.* at 197. Hightower, however, did object to the testimony of Barb Wylie [11] regarding how she came to help with the production of the RFP. *See id.* at 359 ("it's another double form of hearsay"), 361. In admitting the testimony, the court found that the State had laid a proper foundation to support the existence of a conspiracy, and therefore, under Evidence Rule 801(d)(2), the testimony was not hearsay. *Id.* at 360–62. Given that Hightower properly preserved this issue, we now address the propriety of the admission of this portion of Wylie's testimony.

■ Indiana Evidence Rule 801(d)(2)(E) provides: "A statement is not hearsay if . . . [t]he statement is offered against a party and is . . . a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy." In order to introduce evidence of a co-conspirator's statement, the State must lay an evidentiary foundation establishing the existence of a conspiracy. *See Chinn v. State,* 511 N.E.2d 1000, 1002 (Ind.1987). Such proof may be either direct or circumstantial and need not be strong. *See id* (finding an "adequate circumstantial foundation for the existence of a conspiracy.").

Much latitude must, however, be allowed by the court in marshalling the facts and

---

11. Although the record reveals that Wylie went to trial and was convicted of "Count VI, . . . 'Official Misconduct,'" it does not provide details regarding other charges. Tr. at 414. By statute, it is no defense "that the person with whom the accused person is al-

leged to have conspired: (1) has not been prosecuted; (2) has not been convicted; (3) has been acquitted; (4) has been convicted of a different crime; (5) cannot be prosecuted for any reason; or (6) lacked the capacity to commit the crime." Ind.Code § 35–41–5–2.

circumstances which bear upon the issue, and it must be left very largely to the discretion of the court trying the cause to determine whether or not there has been introduced evidence sufficient to establish prima facie the existence of a conspiracy so as to justify the admission of the acts and declarations of one confederate against another.

*Siglar v. State,* 541 N.E.2d 944, 949 (Ind. 1989).

By the time the court made its ruling admitting Wylie's testimony under Rule 801(d)(2), the court had heard the following evidence without objection. The MOU agreement between Results (FSSA IMPACT employees Raibley and Stiles' jointly owned, for-profit consulting company) and Tower (Results' one and only client) was introduced. Although the MOU was purportedly aimed at acquiring out-of-state opportunities, Tower quickly began paying Results $125 per hour for "consulting" in Indiana. The court also heard that in total Tower paid $15,000 to $20,000 to Results, that Tower took advantage of its ties with Results in its dealings with FSSA, that Raibley performed Results work on FSSA time, and that Tower received a no-bid contract worth approximately $425,000 from the FSSA. In addition, the court received evidence that Tower employee Mitchell falsified certifications per Gutierrez's instructions, that Tower received payment from FSSA through vouchers authorized by Raibley, and that Tower did not complete various training sessions for which it was paid.

We cannot say that the court abused it discretion when it considered the aforementioned evidence—though much of it was circumstantial—and found that in the aggregate it constituted independent proof of the existence of a conspiracy between those at Tower and Results. Likewise, the court was within its discretion in finding that what Gutierrez told Wylie was in furtherance of the conspiracy. As such, Wylie's testimony was admissible as an exception to the general prohibition against hearsay. *See, e.g., Houser v. State,* 661 N.E.2d 1213, 1219 (Ind.Ct.App.1996) (finding statements made before and during conspiracy were admissible as exception to general prohibition against hearsay), *trans. denied; see also Francis v. State,* 758 N.E.2d 528, 532–33 (Ind.2001) (admitting witness' testimony as to what co-conspirator said).

■ Hightower's Confrontation Clause argument is also unavailing because co-conspirator statements are nontestimonial. *See Jones v. State,* 834 N.E.2d 167, 168–69 (Ind.Ct.App.2005) (co-conspirator statements, being nontestimonial evidence, do not implicate confrontation rights under *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004)). Even if Hightower's confrontation rights were triggered, Gutierrez testified and was cross-examined extensively at trial.

### II. Sufficiency of Evidence

Hightower challenges the sufficiency of the evidence presented to support his convictions of corrupt business influence, theft/receiving stolen property, conspiracy to commit bribery, and conspiracy to commit forgery. As we address each contention, we keep in mind our well-settled standard of review:

> When the sufficiency of the evidence to support a conviction is challenged, "we neither reweigh the evidence nor judge the credibility of the witnesses, and we affirm if there is substantial evidence of probative value supporting each element of the crime from which a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt." It is the job of the fact-finder to determine whether the evi-

dence in a particular case sufficiently proves each element of an offense, and we consider conflicting evidence most favorably to the trial court's ruling.

*Wright v. State*, 828 N.E.2d 904, 904–06 (Ind.2005) (citations omitted); *see also Staton v. State*, 853 N.E.2d 470, 474 (Ind. 2006).

### A. Corrupt Business Influence

■ A person who is "employed by or associated with an enterprise, and who knowingly or intentionally conducts or otherwise participates in the activities of that enterprise through a pattern of racketeering activity" commits corrupt business influence, a class C felony. Ind.Code § 35–45–6–2(3). As used in the corrupt business influence statute, enterprise means: "a sole proprietorship, corporation, limited liability company, partnership, business trust, or governmental entity[.]" Ind.Code § 35–45–6–1. As Tower's president and chief executive officer, Hightower wrote or approved most checks, controlled its bank accounts and mail, hired employees, and was responsible for the day-to-day operations and company's vision. Thus, sufficient evidence was presented that Tower was an enterprise and that Hightower was associated with it.

■ As applied here, "racketeering activity" means "to commit, to attempt to commit, to conspire to commit a violation of, or aiding and abetting" theft (Ind.Code § 35–43–4–2), receiving stolen property (Ind.Code § 35–43–4–2), fraud (Ind.Code § 35–43–5–4(1) through –4(9)), and bribery (Ind.Code § 35–44–1–1). Ind.Code § 35–45–6–1(14), (15), (17), and (18). "Pattern of racketeering activity" is defined as:

> engaging in at least two (2) incidents of racketeering activity that have the same or similar intent, result, accomplice, victim, or method of commission, or that are otherwise interrelated by distinguishing characteristics that are not isolated incidents. However, the incidents are a pattern of racketeering activity only if at least one (1) of the incidents occurred after August 31, 1980, and if the last of the incidents occurred within five (5) years after a prior incident of racketeering activity.

Ind.Code § 35–45–6–1.

The State presented evidence that Tower billed and received payment from FSSA for upcoming training programs at Perdue Farms, CiCi's Pizza, and Outback Steakhouse. Tr. at 734–36, 819–23, State's Exh. 42. For various reasons including Tower's failure to pay employers a share of the certification fee, the training was not concluded. Tr. at 623–26, 670–71, 828–29, 845–46. When he learned of the problems completing the training, Hightower took no action and was upset that Gutierrez considered informing Raibley. *Id.* at 748–50. There is no indication that Tower issued a refund to FSSA for the early-billed and previously received payment for training that ultimately was not completed. These activities, along with other improper actions detailed *infra*, occurred within a two-year span, had the same goal, and involved many of the same persons. Hightower's challenge to the sufficiency of the evidence to support the corrupt business influence conviction is merely an invitation for us to reweigh evidence and judge testimony.

### B. Theft

■ "A person who knowingly or intentionally exerts unauthorized control over property of another person, with intent to deprive the other person of any part of its value or use, commits theft, a Class D felony." Ind.Code § 35–43–4–2(a). Indiana Code Section 35–41–2–2 states, "[a] person engages in conduct 'intentionally' if, when he engages in the conduct, it is his conscious objective to do

so." "Intent can be inferred from a defendant's conduct and the natural and usual sequence to which such conduct logically and reasonably points." *E.H. v. State,* 764 N.E.2d 681, 683 (Ind.Ct.App.2002), *trans. denied.* "The fact finder is entitled to infer intent from the surrounding circumstances." *Id.* Intent is a mental function; hence, absent a confession, it often must be proven by circumstantial evidence. *See Duren v. State,* 720 N.E.2d 1198, 1202 (Ind.Ct.App.1999), *trans. denied; see also Ritchie v. State,* 809 N.E.2d 258, 270 (Ind. 2004), *cert. denied.*

██ The evidence most favorable to Hightower's three theft convictions reveals strikingly similar scenarios involving three different employers. During 2002, employees at Perdue Farms [12] in Washington, CiCi's Pizzas in Marion County, and Outback Steakhouse in Greenwood were to receive training services from Tower. Tower billed FSSA for the training programs, and, in turn, FSSA prepaid Tower. Tr. at 365–70, 384, 426–27, 734–36, 815–46, 857–61, State's Exh. 42. However, Tower neither completed the training programs for which it had already accepted payment nor did Tower notify FSSA of its failure to meet its obligations. *Id.* at 623–26, 670–71. One of the reasons for the unfinished training was that employers, who were upset by Tower's refusal to pay them their share of certification fees, were not granting access to Tower. *Id.* at 828–29. Hightower, Tower's president and chief executive officer, who was "responsible for the day-to-day operations and vision of the Tower purpose," was informed of the training problems. State's Exh. 46. Despite this knowledge, Hightower, the self-described "head of Tower," did nothing to rectify the situation. Tr. at 95, 743–47, 840–44. Moreover, Hightower bristled at the suggestion that Gutierrez inform Raib-

ley of the "problems." *Id.* at 748–50. Given these circumstances, we conclude that sufficient evidence was presented to support the three counts of theft.

### C. Conspiracy to Commit Bribery

The conspiracy statute provides:

(a) A person conspires to commit a felony when, with intent to commit the felony, he agrees with another person to commit the felony. A conspiracy to commit a felony is a felony of the same class as the underlying felony. However, a conspiracy to commit murder is a Class A felony.

(b) The state must allege and prove that either the person or the person with whom he agreed performed an overt act in furtherance of the agreement.

(c) It is no defense that the person with whom the accused person is alleged to have conspired:

(1) has not been prosecuted;

(2) has not been convicted;

(3) has been acquitted;

(4) has been convicted of a different crime;

(5) cannot be prosecuted for any reason; or

(6) lacked the capacity to commit the crime.

Ind.Code § 35–41–5–2.

 "In proving the agreement element of conspiracy, the State is not required to show an express formal agreement[.]" *Riehle v. State,* 823 N.E.2d 287, 293 (Ind.Ct.App.2005), *trans. denied.* An agreement can be inferred from circumstantial evidence, which may include the overt acts of the parties in furtherance of the criminal act. *See Dickenson v. State,* 835 N.E.2d 542, 552 (Ind.Ct.App.2005),

---

**12.** The allegations concerning Perdue spilled into 2003 as well.

*trans. denied.* "It is sufficient if the minds of the parties meet understandingly to bring about an intelligent and deliberate agreement to commit the offense." *Id.* To determine whether the defendant had the requisite intent to commit the crime alleged, the trier of fact must usually resort to circumstantial evidence or reasonable inferences drawn from examination of the circumstances surrounding the crime. *See id.*

A person who:

(1) confers, offers, or agrees to confer on a public servant, either before or after the public servant becomes appointed, elected, or qualified, any property except property the public servant is authorized by law to accept, with intent to control the performance of an act related to the employment or function of the public servant or because of any official act performed or to be performed by the public servant, former public servant, or person selected to be a public servant

commits bribery, a class C felony. Ind. Code § 35–44–1–1(a)(1). "It is no defense that the person whom the accused person sought to control was not qualified to act in the desired way." Ind.Code § 35–44–1–1(b).

■ The crime of conspiracy "focuses on the intent with which the defendant agrees with another person. It is irrelevant that [the defendant's] conduct could not constitute bribery; what is relevant is the intent and belief [the defendant] had when he agreed with" the conspirators to confer, offer, or agree to confer. *Sawyer v. State,* 583 N.E.2d 795, 798 (Ind.Ct.App. 1991) ("Although it may have been impossible for Sawyer to have committed bribery, impossibility generally is not a defense to a charge of conspiracy.").

■ We reiterate the evidence relevant to this count. Raibley and Stiles were not merely public employees, but IMPACT's director and assistant program manager, respectively. IMPACT, which had a budget of $50,000,000, was FSSA's employment and training section for families that receive public assistance. Tower, a provider of employment training, was founded by Hightower, who was a very involved president and chief executive officer. Hightower hired Gutierrez as vice president of Tower.

Results (Raibley and Stiles' jointly owned, for-profit consulting company) and Tower (Results' one and only client) entered into the MOU agreement, the stated purpose of which was to "form a working relationship between the two companies in order to promote the best interest of each company's interests[.]" State's Exh. 2. Further, Tower and Results "agree[d] to pursue joint ventures in the business of social service delivery." *Id.* The MOU provided that Tower would pay Results for, *inter alia,* identifying funding sources, locating joint cooperative ventures, assisting with proposals, performing presentations in support of Tower, and informing Tower of relevant social service trends, legislation, and strategies. *See id.*

Despite the purported original goal of focusing on out-of-state opportunities so as to avoid ethical issues, soon after the MOU was signed, Tower began paying Results $125 per hour for "consulting" in Indiana. In total, Tower paid $15,000 to $20,000 to Results. Due to its ties with Results, Tower had superior access to FSSA, at one point being awarded a no-bid contract worth more than $400,000. While Raibley did not have ultimate authority regarding that decision, he recommended Tower. Raibley also authorized Tower vouchers for work that was never completed.

Having been apprised of the relationship between Tower and Results as well as the aforementioned overt acts, the court could reasonably infer that Hightower (through Tower) paid Raibley and Stiles (through Results) to utilize their official positions to provide special treatment and financial opportunities for Hightower (through Tower). That is, the State presented sufficient evidence to support Hightower's conviction of conspiracy to commit bribery. *See Sawyer*, 583 N.E.2d at 798 (upholding conviction where defendant agreed to pay money in exchange for influence in resolving a zoning matter his way).

### D. Conspiracy to Commit Forgery

"A person who, with intent to defraud, makes, utters, or possesses a written instrument in such a manner that it purports to have been made" by another person, at another time, with different provisions, or by authority of one who did not give authority commits forgery, a class C felony. Ind.Code § 35-43-5-2(b). Again, a person conspires to commit a felony when, with intent to commit the felony, he agrees with another person to commit the felony, and either the person or the person with whom he agreed performed an overt act in furtherance of the agreement. Ind.Code § 35-41-5-2.

■ The evidence relevant to this count revealed that Tower submitted vouchers and supporting documents that had been altered to conform with guidelines required to receive payment from FSSA. The deletions and changes to eligibility information were performed by or at the direction of Gutierrez, Tower's vice president. Despite the inaccuracies, Hightower and Gutierrez signed the documents, thereby certifying that the information was true. While Hightower claimed not to have made or directed any alterations, he was responsible for day-to-day operations. Moreover, when Gutierrez directly brought up the falsified social security numbers and inaccuracies, Hightower responded that they "did so much for free" and asked if Gutierrez "had told anybody." Tr. at 743. Hightower neither requested to know which vouchers were falsified nor replied that FSSA should be notified. *Id.* When Hightower and Gutierrez had subcontracted for OIC, similar alterations had been made, and Hightower's reaction had been similarly nonresponsive. Given the facts presented, we conclude that the State presented sufficient evidence to support Hightower's conviction for conspiracy with Gutierrez to commit forgery. To conclude otherwise would be to reweigh evidence, a task we are not permitted to perform on appeal.

### III. Sentencing

■ Hightower challenges his sentence on a variety of grounds: *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), Appellate Rule 7(B), and weighing and balancing aggravators and mitigators. Before we address these arguments, we observe that between the dates of Hightower's offenses—which the charging information alleged occurred between 2002 and 2003—and the date of sentencing, February 10, 2006, Indiana Code Section 35-50-2-6 was amended to provide for "advisory" sentences rather than "presumptive" sentences. *See* P.L. 71-2005, § 9 (eff.Apr.25, 2005). This Court has previously held that the change from presumptive to advisory sentences should not be applied retroactively. *See Weaver v. State*, 845 N.E.2d 1066, 1069–72 (Ind.Ct.App.2006), *trans. denied; but see Samaniego–Hernandez v. State*, 839 N.E.2d 798, 805 (Ind.Ct.App.2005), *trans. not sought*. Therefore, we operate under the earlier "presumptive" sentencing scheme when addressing Hightower's sentence.

At the time that Hightower committed his offenses, the presumptive sentence for a class C felony was four years with the possibility of four years being added for aggravating circumstances and two years being subtracted for mitigating circumstances. *See* Ind.Code § 35-50-2-6. The presumptive sentence for a class D felony was one and one-half years with the possibility of one and one-half years being added for aggravating circumstances and one year being subtracted for mitigating circumstances. *See* Ind.Code § 35-50-2-7. For each of his three C felony convictions, Hightower received a four-year total sentence, with two years executed and two years suspended. For each of his three D felony convictions, Hightower received a two-year total sentence, with one year executed and one year suspended. All terms were to be concurrent, with the first year executed at the Indiana Department of Correction and the second year in Community Corrections.

### A. Blakely

Hightower asserts that his constitutional rights were violated by the court's failure to instruct him on his right to a jury regarding aggravators for sentencing. Appellant's Br. at 52. Hightower contends that because he did not stipulate to any convictions and was not questioned regarding his criminal history, the court violated *Blakely* by using his nolo contendere plea to aggravate his class D felony sentences beyond the presumptive eighteen months.[13]

In the spring of 2004, Hightower was charged for activities that allegedly occurred during 2002 and 2003. On June 24, 2004, the United States Supreme Court decided *Blakely*, which held that facts supporting an enhanced sentence must be ad-

mitted by the defendant or found by a jury. On March 9, 2005, our supreme court issued *Smylie v. State*, 823 N.E.2d 679, 686 (Ind.2005), *cert. denied*, in which it held that the "sort of facts envisioned by *Blakely* as necessitating a jury finding must be found by a jury under Indiana's existing sentencing laws." Hightower was tried and convicted in December 2005; he was sentenced in February 2006.

The court provided a thoughtful, lengthy explanation for its sentencing decision. The court noted how well-behaved and respectful Hightower was during trial, how he had some education, how he had helped people in the past, and how various individuals had written or spoken positively about his character. Tr. at 1040-42. Conversely, the court opined that greed had led to the crimes, and focused on "the way that the crime was committed, and the way that it had to go on for such a long period of time, and that so many people were affected, and the large amount of taxpayer money that was involved." *Id.* at 1043. The court went on:

> . . . I don't doubt that you will, when that sentence is served, go out and try to bounce back again and take care of your family and become someone who tries to contribute to society.
>
> What's troubled me most about you is that you had had this brush before with the law. You had—you know, you call it what you want, but I know that you have, from the Presentence Investigation, embezzlement by employee. So you've been down some sort of similar road before. Even if it weren't a conviction, just the fact that you had the experience somewhere else should've made you so tuned in and so aware.
>
> And I really think that you thought that you weren't going to get caught,

---

**13.** Given that *Blakely* applies only to sentences beyond the presumptive, *see Prickett v. State*, 856 N.E.2d 1203, 1210 (Ind.2006),

Hightower wisely does not make a *Blakely* challenge to the presumptive sentences he received for his class C felonies.

and that the money was just too much to pass by. And I guess that's why you got yourself in this chair again.

So while your prior criminal history, in and of itself, it can't be a significant aggravating circumstance, because I recognize it was a nolo plea, but I also recognize that if you received any—any sentence or sanction for it, that it is something this Court would recognize as a conviction.

It was just that, something in 1998, that was a misdemeanor. But what makes it the most troubling is that it's of a similar nature as what you're here for today....

.... So just because someone was associated [with] Raibley doesn't—doesn't automatically mean that they, you know, got lumped in and convicted of some offense. It took a willing person.

You were a personable, friendly guy, that I'm sure could get a lot of business just by going out and selling yourself and what you do. You could've used that for good or you can use it for bad. And obviously, it's the Court's opinion, from the evidence, that you used it in the wrong way.

*Id.* at 1043–45.

■ In sum, the court utilized Hightower's prior criminal history as well as the nature and circumstances of the current crimes to justify the slightly enhanced sentence. Hightower does not challenge the latter on *Blakely* grounds. As for the former, "[b]y its own terms, and as consistently recognized by our cases analyzing *Blakely,* an enhancement based upon criminal history does not trigger a *Blakely* analysis." *Dillard v. State,* 827 N.E.2d 570, 575 (Ind.Ct.App.2005), *trans. denied.* Moreover, contrary to Hightower's assertions on appeal, he was questioned about his criminal history and did admit to the misdemeanor conviction. Tr. at 933–35. Specifically, in 1998, Hightow-

er entered a nolo contendere plea to "embezzlement by employee" in California.App. at 236. A plea of nolo contendere "is an admission of guilt" in the case in which it is pleaded. *Esarey v. Buhner Fertilizer Co.,* 117 Ind.App. 291, 294, 69 N.E.2d 755, 757 (1946); *see Gomez v. Berge,* 434 F.3d 940, 942–43 (7th Cir.2005) (like a guilty plea, a no contest plea admits the allegations in the charging information or indictment), *cert. denied; see also People v. Mazurette,* 24 Cal.4th 789, 794, 102 Cal.Rptr.2d 555, 14 P.3d 227 (Cal.2001) (treating nolo contendere interchangeably with no contest and not guilty pleas). Accordingly, Hightower has not demonstrated a *Blakely* problem.

### B. Balancing Aggravators and Mitigators

■ Hightower contends that the court abused its discretion by failing to either acknowledge statutory mitigators or to properly balance the aggravators and mitigators. In particular, he claims that the court "erred by failing to consider the hardship incarceration would impose" on Hightower's family or Hightower's development of "programs which trained hundreds of the hardest to place citizens to make them ... eligible." Appellant's Br. at 50. He also raises the nolo contendere plea again.

■ In general, sentencing lies within the discretion of the trial court. *Henderson v. State,* 769 N.E.2d 172, 179 (Ind.2002). As such, we review sentencing decisions only for an abuse of discretion, "including a trial court's decision to increase or decrease the presumptive sentence because of aggravating or mitigating circumstances." *Id.* Furthermore, when enhancing a sentence, a trial court must: "(1) identify significant aggravating and mitigating circumstances; (2) state the specific reasons why each circumstance is aggravating or mitigating; and (3) evalu-

ate and balance the mitigating against the aggravating circumstances to determine if the mitigating offset the aggravating circumstances." *Vazquez v. State,* 839 N.E.2d 1229, 1232 (Ind.Ct.App.2005), *trans. denied.* A single aggravating circumstance is adequate to justify an enhanced sentence. *Moon v. State,* 823 N.E.2d 710, 717 (Ind.Ct.App.2005), *trans. denied.* "Generally, the weight assigned to a mitigator is at the trial judge's discretion, and the judge is under no obligation to assign the same weight to a mitigating circumstance as the defendant." *Covington v. State,* 842 N.E.2d 345, 348 (Ind. 2006).

As the excerpt from the sentencing hearing demonstrates *supra,* the court considered Hightower's family. Tr. at 1043. However, the court did not find that *undue* hardship would be suffered by them, nor does Hightower make that argument on appeal. Likewise, the court did acknowledge the good that Hightower had accomplished through his work, but noted that it was tempered by the crimes committed and the numerous persons affected. *Id.* at 1041. The court was troubled by Hightower's prior history, which was neither lengthy nor felonious, but did involve fairly recent, improper activities similar to those at issue here. *See Prickett,* 856 N.E.2d at 1209 ("[T]he significance of a defendant's prior criminal history in determining whether to impose a sentence enhancement will vary 'based on the gravity, nature and number of prior offenses as they relate to the current offense.' "). Under the circumstances, we cannot say that the court abused its discretion in identifying, weighing, or balancing the aggravators and mitigators, and enhancing the class D felony sentences by six months.

### C. Appellate Rule 7(B)

Article VII, Section 6 of the Indiana Constitution outlines our jurisdiction as follows:

The Court shall have no original jurisdiction, except that it may be authorized by rules of the Supreme Court to review directly decisions of administrative agencies. In all other cases, it shall exercise appellate jurisdiction under such terms and conditions as the Supreme Court shall specify by rules which shall, however, provide in all cases an absolute right to one appeal and to the extent provided by rule, review and revision of sentences for defendants in all criminal cases.

Pursuant to that authority, our supreme court provided that "[t]he Court may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." Ind. Appellate Rule 7(B). "Regarding the nature of the offense, the presumptive sentence is the starting point the Legislature has selected as an appropriate sentence for the crime committed." *Weiss v. State,* 848 N.E.2d 1070, 1072–73 (Ind. 2006).

■ In challenging his "sentence beyond the presumptive," Hightower argues that his "minimum contact with the criminal system does not place [him] in the character of offenders reserved for the maximum sentence." Appellant's Br. at 53. We point out that Hightower did not receive the maximum sentence. Indeed, for his three class C felonies, Hightower received the presumptive sentence of four years, only one of which was to be served at the Indiana Department of Correction. While the court did enhance the sentences for the class D felonies, it added just six months rather than eighteen months to the presumptive eighteen months. Further, the court made all the sentences concur-

rent, suspended half of the time for each, and permitted Hightower to serve one year in community corrections. Hightower was convicted of seven felonies: corrupt business influence, three conspiracy counts, and three thefts. These crimes concerned taxpayer money, an erosion of trust in a public agency, and misuse of funds intended to train those without jobs. This is not the first time that Hightower has been involved in dishonest activity related to his employment. After due consideration of the court's sentencing decision, we do not find Hightower's sentence inappropriate in light of the nature of the offenses and his character.

### IV. Correction of Abstract of Judgment

Finally, Hightower asserts that the court's sentencing order and abstract of judgment do not correspond with the amended charging information. We agree. As set out in the Facts and Procedural History *supra,* the amended charges upon which Hightower was convicted were identified as I through VI and X. He was sentenced on all but count II, conspiracy to commit theft. However, the abstract of judgment lists the counts upon which Hightower was sentenced as 1, 4, 6, 8, 11, and 33. Given the multiple defendants, numerous charges, and various amendments in this case, this scrivener's error is not entirely surprising. While fortunately the mistake is not substantive, we remand for correction of the abstract of judgment so it accurately reflects the counts as designated with roman numerals in the amended charging information.

Affirmed and remanded with instructions.

SULLIVAN, J., and SHARPNACK, J. concur.