## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



ATTORNEY FOR APPELLANT

Steven E. Ripstra
Ripstra Law Office
Jasper, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

John R. Millikan
Deputy Attorney General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

Jordan M. Hunt,
*Appellant-Defendant,*

v.

State of Indiana,
*Appellee-Plaintiff.*

February 28, 2020

Court of Appeals Case No.
19A-CR-1998

Appeal from the Pike Circuit Court

The Honorable Jeffrey L. Biesterveld, Judge

Trial Court Cause No.
63C01-1809-F5-766

**Bradford, Chief Judge.**

# Case Summary

[1] Beginning in October of 2017, Jordan Hunt and C.P.K. were involved in an on-again, off-again romantic relationship. C.P.K. ended the relationship in September of 2018. Eleven days after C.P.K. ended the relationship, Hunt shot and attempted to burn C.P.K.'s two dogs. Given his actions toward her dogs, C.P.K. became fearful that Hunt could potentially harm her. Hunt was subsequently charged with and convicted of Level 6 felony domestic violence animal cruelty. On appeal, Hunt challenges the sufficiency of the evidence to sustain his conviction.

# Facts and Procedural History

[2] Hunt began dating C.P.K. in October of 2017. When they began dating, C.P.K. owned a five- or six-year old pitbull-lab mix named Roxy. While dating Hunt, C.P.K. acquired a four-month old golden labradoodle named Willow. C.P.K. loved her dogs and referred to them as her "babies." Tr. Vol. II p. 168. Hunt would occasionally spend time with C.P.K. and her dogs and knew that they "were a big part of [her] life." Tr. Vol. II p. 190.

[3] C.P.K. ended her relationship with Hunt on May 23, 2018, before engaging in an on-again, off-again relationship for the next few months while they tried to "work things out." Tr. Vol. II p. 194. At some point, C.P.K. became aware that Hunt was abusing prescription pain medication and, on September 14, 2018, ended her relationship with Hunt.

[4]     On September 25, 2018, C.P.K. came home to find that Roxy and Willow were missing. No other valuables were missing from her home and a dog that she was dog-sitting for a friend was in the bathroom. C.P.K. immediately suspected that Hunt had taken her dogs. She attempted to contact him, "begging him to bring the dogs back." Tr. Vol. II p. 171. Hunt did not respond. Later that evening, C.P.K.'s mother, Lori Bruce, posted a reward for return of the dogs on Facebook along with pictures of Hunt, the dogs, and Hunt's red truck.

[5]     At approximately 1:00 or 1:30 a.m., Toni Parker saw Hunt outside her home and heard him speaking to her father. Parker overheard Hunt telling her father "that he had a couple dogs that he need to – that nobody wanted and he was trying to get rid of" and asking if he could "keep them up in our barn." Tr. Vol. II p. 52. Later that day, at "[a]round 9:30–10:00 in the morning," Parker was awakened by a "bang on [her] window." Tr. Vol. II p. 52. Hunt asked if Parker's brother was present, stating that he "was hung up in the mud up by the barn and that he needed someone to pull him out." Tr. Vol. II p. 55. While Hunt was waiting for assistance, Parker scrolled through Facebook on her phone, observing Bruce's post indicating that Hunt had stolen C.P.K.'s two dogs. Parker responded to the Facebook post, alerting Bruce that Hunt was at her home.

[6]     Approximately fifteen minutes later, Parker's father returned home from work to help pull Hunt's truck out of the mud. Hunt then left Parker's home and walked back toward the barn, which was approximately fifty yards away. After

pulling Hunt's truck out of the mud, Parker's father opened the barn door. Parker observed two dogs, which looked similar to the dogs pictured in Bruce's Facebook post, "fly out" of the barn. Tr. Vol. II p. 64.

[7] Around lunchtime, Parker observed Hunt walking through a field next to her home with two dogs that she identified as Roxy and Willow. After turning away from Hunt and the dogs, Parker heard two gunshots coming from the nearby field. Parker "put two (2) and two (2) together. Two (2) dogs were down there two (2) gunshots." Tr. Vol. II p. 72. At the time of the shooting, Parker did not see anyone else on the property. The last thing she had observed in the field prior to hearing the gunshots was Hunt and the two dogs.

[8] Parker messaged Bruce and asked Bruce to call her "ASAP." Tr. Vol. II p. 72. When Bruce called, Parker, who was "crying very hard," told her that Hunt "shot your dogs." Tr. Vol. II p. 72. At Bruce's request, Parker walked toward the field to investigate further. As she approached, Parker observed Hunt's "head pop[] up" and "a puff of smoke" from the area between the field and a creek. Tr. Vol. II p. 73. A few moments later, she observed Hunt hurriedly "takin (sic) off" in his red truck. Tr. Vol. II p. 83. Parker went to the area beside the field and, after "lifting brush off" observed the "back portion of two (2) dogs laying side by side." Tr. Vol. II p. 83. C.P.K. eventually arrived and identified the dogs and Roxy and Willow. Evansville Police Detective Nicholas Henderson also arrived on the scene and observed that the dogs both had suffered wounds that were consistent with being shot by a firearm.

On September 26, 2018, the State charged Hunt with Level 5 felony intimidation, Level 6 felony domestic violence animal cruelty, and Level 6 felony killing a domestic animal. Following trial, the jury found Hunt not guilty of the Level 5 felony intimidation charge but guilty of both Level 6 felony domestic violence animal cruelty and Level 6 felony killing a domestic animal. At sentencing, the trial court vacated the killing-a-domestic-animal conviction and imposed a two-and-a-half year sentence on the domestic-violence-animal-cruelty conviction.

# Discussion and Decision

Hunt contends that the evidence is insufficient to sustain his conviction. "Our standard of review for challenges to the sufficiency of the evidence is well-settled." *Bell v. State*, 31 N.E.3d 495, 499 (Ind. 2015).

> We do not reweigh evidence or reassess the credibility of witnesses when reviewing a conviction for the sufficiency of the evidence. We view all evidence and reasonable inferences drawn therefrom in a light most favorable to the conviction, and will affirm if there is substantial evidence of probative value supporting each element of the crime from which a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt.

*Walker v. State*, 998 N.E.2d 724, 726 (Ind. 2013) (internal citation and quotation omitted). This is because the factfinder, and not the appellate court, "is obliged to determine not only whom to believe, but also what portions of conflicting testimony to believe, and is not required to believe a witness's testimony[.]"

*Perry v. State*, 78 N.E.3d 1, 8 (Ind. Ct. App. 2017) (internal quotation and brackets omitted). "A conviction can be sustained on only the uncorroborated testimony of a single witness[.]" *Bailey v. State*, 979 N.E.2d 133, 135 (Ind. 2012).

[11] Indiana Code section 35-46-3-12.5 provides that "[a] person who knowingly or intentionally kills a vertebrate animal with the intent to threaten, intimidate, coerce, harass, or terrorize a family or household member commits domestic violence animal cruelty, a Level 6 felony." "A person engages in conduct 'intentionally' if, when he engages in the conduct, it is his conscious objective to do so." Ind. Code § 35-41-2-2(a). "A person engages in conduct 'knowingly' if, when he engages in the conduct, he is aware of a high probability that he is doing so." Ind. Code § 35-41-2-2(b). In challenging his conviction, Hunt claims that the State failed to present sufficient evidence to prove that (1) he knowingly or intentionally killed C.P.K.'s dogs and (2) he did so with the intent to threaten, intimidate, coerce, harass, or terrorize C.P.K.

## I. Knowing or Intentional Killing

[12] Intent is a mental function. *Spann v. State*, 632 N.E.2d 741, 743 (Ind. Ct. App. 1994). Absent an admission by the defendant, it must be determined from a consideration of the defendant's conduct and the natural and usual consequences thereof. *Id.* The trier of fact must resort to "reasonable inferences based upon an examination of the surrounding circumstances to determine whether, from the person's conduct and the natural consequences that might be expected from that conduct, a showing or inference [of] the intent to commit that conduct exists." *Id.* (quoting *Metzler v. State*, 540 N.E.2d 606, 609 (Ind. 1989)).

*James v. State*, 755 N.E.2d 226, 230 (Ind. Ct. App. 2001). Intent may be proven by circumstantial evidence. *Hightower v. State*, 866 N.E.2d 356, 368 (Ind. Ct. App. 2007).

"When determining whether an element of an offense has been proven, the jury may rely on its collective common sense and knowledge acquired through everyday experiences—indeed, that is precisely what is expected of a jury." *Clemons v. State*, 83 N.E.3d 104, 108 (Ind. Ct. App. 2017). Parker testified that she observed C.P.K.'s dogs alive and walking beside Hunt moments before she heard two gunshots, observed a puff of smoke coming from an apparent brush fire, and found the dogs dead. She did not observe anyone else in the area besides Hunt. The jury, relying on its collective common sense and knowledge, could reasonably infer from Parker's testimony that Hunt knowingly or intentionally shot and killed C.P.K.'s dogs before attempting to burn them in a brush fire.

## II. Intent to Terrorize C.P.K.

The State alleged that Hunt acted with the intent to terrorize C.P.K. "Terrorize" may be defined as "to fill with terror or anxiety: SCARE." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2361 (1964). The jury, acting as the trier-of-fact, must resort to reasonable inferences based upon an examination of the surrounding circumstances to determine whether, from Hunt's conduct and the natural consequences that might be expected from that

conduct, a showing or inference of the intent to terrorize C.P.K. exists. *See James*, 755 N.E.2d at 230.

[15] Hunt knew that C.P.K.'s dogs "were a big part of [her] life" and that she loved them. Tr. Vol. II p. 190. Roxy, specifically, "was [her] entire world." Tr. Vol. II p. 161. Approximately eleven days after C.P.K. ended their relationship, Hunt took the dogs from C.P.K.'s home. Hunt shot both dogs before attempting to burn their bodies. After observing the condition of her beloved dogs, C.P.K. became fearful that Hunt could potentially harm her. Detective Henderson confirmed that when he spoke to C.P.K. a short time later she was very distraught, crying, and hysterical. We agree with the State that "[i]t was to be expected that the natural consequences of these acts were for C.P.K. to be filled with intense or overwhelming fear." Appellee's Br. p. 14. Based on the circumstances surrounding Hunt's actions, the jury could reasonably infer that Hunt acted with the intent to terrorize C.P.K.

[16] In sum, we conclude that the evidence is sufficient to prove both that Hunt knowingly or intentionally killed C.P.K.'s dogs and that he did so with the intent to terrorize C.P.K. Hunt's claims to the contrary amount to an invitation to reweigh the evidence, which we will not do. *See Walker*, 998 N.E.2d at 726.

[17] The judgment of the trial court is affirmed.

Robb, J., and Altice, J., concur.