

FILED

Oct 23 2023, 8:33 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Lisa D. Manning
Plainfield, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Attorney General of Indiana

Steven J. Hosler
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Tyreontay T. Jackson,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff.* | October 23, 2023<br><br>Court of Appeals Case No.<br>22A-CR-2679<br><br>Appeal from the Hendricks Circuit<br>Court<br><br>The Honorable Daniel F. Zielinski,<br>Judge<br><br>Trial Court Cause No.<br>32C01-2105-MR-5 |

**Opinion by Judge Kenworthy**
Chief Judge Altice and Judge Vaidik concur.

**Kenworthy, Judge.**

## Case Summary

[1] On a mid-December afternoon in 2020, Freddie "Duce" Hegwood and Victor "VJ" Griffin sat in a parked car in a Brownsburg neighborhood when gunshots rang out from a black car passing by. Hegwood was shot and killed. A bullet passed through the hood of Griffin's sweatshirt, but he escaped unharmed and told police four men were in the black car. Several months of investigation led to the identification of four suspects: Tyreontay Tyrin Jackson, Antonio Lane, Kamarion Moody, and Jeremy Perez.

[2] The State charged Jackson with murder,[1] Level 1 felony attempted murder,[2] and two counts of Level 5 felony criminal recklessness[3] as an accomplice.[4] The State also sought sentencing enhancements for use of a firearm[5] and participation in a criminal organization.[6] A jury found Jackson guilty as charged for his participation in the shooting, and determined he was subject to the criminal organization enhancement. Jackson appeals, claiming the trial court erred in admitting certain evidence over his hearsay objection and there

---

[1] Ind. Code § 35-42-1-1(1) (2018).

[2] I.C. §§ 35-42-1-1(1) and 35-41-5-1(a) (2014).

[3] I.C. § 35-42-2-2(a) and (b)(2)(A) (2019).

[4] I.C. § 35-41-2-4 (1977).

[5] I.C. § 35-50-2-11(d) (2016).

[6] I.C. § 35-50-2-15(b) (2016).

was insufficient evidence to convict him of murder and attempted murder. We affirm.

## Facts and Procedural History[7]

This incident arose out of a feud between rival gangs: Davo, a subgroup of the Insane Money Gang ("IMG") and My Brother's Keeper, a subgroup of the Kutthroat Gang ("KTG"). Jackson, Lane, Moody, and Perez, among others, were "linked together in numerous social media posts, photographs and videos, and conversations[] and music videos on social media and YouTube" and identified as IMG/Davo members. *Appellant's App. Vol. 2* at 27. Hegwood, Griffin, and Johnny Alvarado are members of KTG.

"Davo" is named after David Lowery, an IMG member, who was killed in June 2020. Jackson has a tattoo on his arm depicting the name "David" and the date "06-07-20." *Ex. Vol. 6* at 146. Lane and Moody have tattoos with similar content. Marion McGrew posted a video to his YouTube channel featuring Moody, who had "made a name for himself in the city as a very good aspiring rapper[,]" *Tr. Vol. 3* at 111, performing a tribute to Lowery. The tribute includes words to the effect of "ever since you died we been at war with that whole side." *Ex. Vol. 7* at 103 ("Davo Story" video). Jackson and Lane, among

[7] We held oral argument in this case on September 11, 2023, at Gainbridge Fieldhouse in Indianapolis, Indiana. We extend our appreciation to Danny Lopez and Pacers Sports and Entertainment for the invitation and hospitality. We also thank all those who attended, especially the students from New Palestine High School, Charles A. Tindley Accelerated School, Cardinal Ritter High School, Purdue Polytechnic High School, Blue River Career Center, Herron High School, and IU McKinney School of Law for their attention and insightful questions.

others, appear in the video. Jackson, Lane, and Moody went to school with Lowery, and police theorized they "formed a gang to pursue criminal activity in Mr. Lowery's name" after his death. *Tr. Vol. 3* at 130.

In July 2020, an IMG associate was shot at the Indiana State Fairgrounds. Alvarado, driving a car in which Hegwood and Griffin were passengers, was stopped leaving the Fairgrounds and Griffin was arrested for possession of two handguns. From then until mid-December, members of the two gangs exchanged messages over text and posted taunting and threatening content on social media. An Indianapolis Metropolitan Police Department ("IMPD") detective explained it is common for gang members to post rap lyrics and music videos on Instagram and Facebook "talking about the other group" or share photos "with words on it disrespecting the other group" as a form of "rivalry behavior." *Id.* at 77. Members display guns, threaten the other group, and discuss shootings that have taken place—"it's just constantly back and forth." *Id.* at 78.

On July 2, McGrew posted on Instagram a "taunting" picture of himself and Lane outside Griffin's house. *Id.* at 165. The image showed McGrew standing on the hood of a car in the driveway holding a firearm, and Lane leaning against the car holding cash, with the caption: "We taking pictures outside da opps[8] crib . . . & this his momma's car[.]" *Ex. Vol. 6* at 159. Jackson posted a

---

[8] "Opps" means "[o]pposition. Usually, the group that they're feuding with at the time." *Tr. Vol. 3* at 117.

video of the same location and car on his Instagram story—although McGrew and Lane are not pictured, guns are displayed in the video. At some point between the shooting at the Fairgrounds and Hegwood's death, Moody and McGrew posted a music video to YouTube depicting Moody rapping as several other people held guns and an image of Alvarado's head bounced around the screen and was placed in an oven. McGrew, Jackson, and Lane appear in the video.

[7] In early November, a group conversation was initiated on Instagram by Ramonte Scruggs. Scruggs added Jackson and Moody, among others, to the conversation and said, "Duce a deadman on David[.]" *Id.* at 169. When one of the participants responded with a question mark, Scruggs shared the following screen shot of text messages he received from Hegwood:



*Id.* at 171.

[8]    In late November, Davo members began repeatedly prodding Hegwood to share his location. Jackson and Hegwood exchanged many messages over approximately a week at the end of November/beginning of December urging each other to share their locations. *See id.* at 172–87 (texts from November 25

to December 6). Hegwood did share his location several times including on December 4 when he was on Homestead Drive in Brownsburg— "where [he] used to live[,] literally next-door neighbor from the murder location[.]" *Tr. Vol. 3* at 204. Beginning on December 6 and continuing into December 14, Hegwood exchanged similar messages with Lane. *See Ex. Vol. 6* at 199–213. During that same time, Hegwood and Jackson exchanged calls, some answered and some unanswered.

[9] On December 14, Hegwood recorded an Instagram live video from outside Moody's home saying, "somebody tell Kam come home" with text imposed over the image saying, "cut that trip early[.]" *Id.* at 145. Also on December 14, Perez texted Jackson and said, "U still tryn Shoot?" *Id.* at 238. Jackson did not respond via text.

[10] In the early morning hours of December 15, a video was recorded on Perez's phone of several people—including himself, Jackson, Lane, and Moody— standing around a black vehicle armed with AR-15 rifles and handguns. Jackson is seen holding an AR-15 that can fire .223-caliber ammunition and a magazine loaded with .223-style rounds is displayed. *See Tr. Vol. 3* at 227; *Ex. Vol. 7* at 11.

[11] Later that day, Hegwood recorded an Instagram live video while driving in which he was apparently reading threats being made in the comments, flashed a gun, and claimed "he was going to find Davo and beat his ass." *Tr. Vol. 3* at 192; *see Ex. Vol. 6* at 145. That afternoon, Hegwood picked up Griffin and they

drove to a gas station on 56th Street and Georgetown Road in Indianapolis, where they remained for about thirty minutes. While they were there, Jayvon Irvin sent a text message to Perez, stating, "follow them it's only duce an victor . . . follow em[.]" *Ex. Vol. 6* at 223. Cell phone location data placed Jackson, Lane, Moody, and Perez in the area of the gas station around this time.

[12] When Hegwood and Griffin left the gas station, they drove to a friend's house in the Branches neighborhood in Brownsburg. They arrived shortly before 3:00 p.m. and parked in front of the friend's house. Hegwood recorded another short Instagram live video of himself and Griffin sitting in the vehicle. At around 3:00 p.m., as neighborhood children were exiting the school bus, a black car drove by Hegwood's vehicle and multiple shots rang out. The children ran to shelter in an open garage. Several bullets pierced the walls of a nearby residence, but no one was home. Both .40-caliber and .223-caliber bullets fired from at least three different weapons were recovered from the scene. Hegwood sustained four gunshot wounds, including a fatal wound to his head from a .223 round. *See Tr. Vol. 3* at 221. Griffin was unharmed, although a bullet passed through the hood of the sweatshirt he was wearing and there was bullet damage to the headrest of his seat. He told police there were four men in the black car and at least two of them on the driver's side shot into Hegwood's vehicle.[9]

---

[9] After giving this statement at the scene, Griffin stopped cooperating with police and did not appear at Jackson's trial despite being personally served with a subpoena.

[13] Moody began exchanging text messages with his mother about thirty minutes after the shooting. Later that evening, Moody asked his mother to have somebody—but not her—"come get This car." *Ex. Vol. 7* at 95. He told her he was "at the Stu[10] recording" and sent the address. *Id*. Jackson, Lane, and Perez were with Moody at the studio.

[14] On December 19, Perez texted Jackson and said, "Don't stay brotha u tweakin . . . U was wit us[.]" *Ex. Vol. 6* at 239–40. On or around that same day, Lane, Moody, and Perez traveled by bus to California. On December 20, Moody sent Jackson a message on Instagram saying, "Bitch yu should've came wit us . . . we goin to La we got ah rental me jerm & ton[.]" *Id.* at 227. Jackson replied, "Shidd I'll fly whenever yall make it jus get the ticket[.]" *Id*. Jackson arrived in California on December 22.

[15] While in California, Moody wrote a rap "directly related to Mr. Hegwood and what happened to him" and threatening Griffin:

> that backdoor shit fr , facts we get his Lo we at his crib like we deliver dash want beef deliver fast , got on live we caught his ass , we 456 his ass , neva been da type too spin ah night I'm just gone hit yo ass , blitz em cappin onnat Insta fa dem bitches now yu wit em , we just bought hella glocks go ask da opps ik they feel em , my main opp just got dropped bitch I'm in Cali wit dem killers , niggas goofy all on live didn't know we stocked em till we kilt em ,ike fuc it let's get onnat fed shit , Ik niggas shiddy deucy dead that boy ah dead bitch hit all in his fucking head heard they made his head twist , well what about vj nem they next onnat dead list shsssshh pop sum , heard he do tattoos we get his drop then we gone drop sum
>
> we get his Lo we at his crib like we deliver dash

---

[10] The "stu" was a recording studio on South Meridian Street in Indianapolis.

*Tr. Vol. 4* at 5; *Ex. Vol. 7* at 77. These lyrics appeared in the Notes app on Moody's phone, and there was also a video saved in Moody's phone of him performing those lyrics.

[16] Sergeant Charles Tyree of the Hendricks County Sheriff's Department was the lead detective on Hegwood's murder. He described a "very in-depth investigation" with "massive data collection" over a period of six months. *Tr. Vol. 3* at 155. During the investigation, police traced the black car to Moody's mother. A search of the car revealed, among other things, shell casings matching those found at the scene. Hegwood's mother permitted police to download the contents of Hegwood's phone. Police also received tips of partial names and social media accounts/usernames of people who might be involved. Sifting through the data, police were able to make connections between the Davo members. The investigation initially focused on Moody, Perez, and McGrew because "they were the most active [on social media], . . . posting with firearms like constantly." *Id.* at 89.

[17] Jackson was not immediately on the police radar; police had a phone number that was communicating with Hegwood in the weeks before his murder, but it took some time to connect that phone number to Jackson. Once Jackson was identified, analysis of his Instagram account revealed multiple images and videos referring to Davo. Jackson was in possession of some type of firearm in many images. He appeared in the Davo Story video and in the Alvarado video. DNA analysis of a lighter found in the black car provided "very strong support" for inclusion of Jackson as a contributor of DNA obtained from it. *Tr. Vol. 4* at

120.  Cell phone location data placed Jackson, along with Lane and Moody, in the Branches neighborhood around the time of the shooting.

[18]  Jackson, Lane, Moody, and Perez eventually returned to Indiana.  Lane moved to northern Indiana and was arrested in May 2021.  Jackson, Moody, and Perez were located at Perez's girlfriend's apartment in Speedway and arrested in July 2021.[11]

[19]  Jackson was charged with four counts: murder; attempted murder; and two counts of criminal recklessness, one for shooting a firearm into a dwelling and one for shooting a firearm "about a place where people are likely to gather[.]" *Appellant's App. Vol. 2* at 21.  The State also filed a criminal organization enhancement and an enhancement for use of a firearm during the commission of the offenses.  Following a five-day jury trial in July 2022, the jury returned guilty verdicts on all four counts and found the State had proved the criminal organization enhancement but not the firearm enhancement.  Jackson was sentenced to an aggregate term of 143 years.[12]  He now appeals his convictions.

---

[11] Jackson, Lane, Moody, and Perez were all charged with crimes arising from these events and tried separately in Hendricks Circuit Court.  Moody and Lane were found guilty in their trials and their convictions were affirmed on appeal.  *See Moody v. State*, 22A-CR-2672 (Ind. Ct. App. July 21, 2023) and *Lane v. State*, 22A-CR-275 (Ind. Ct. App. Aug. 30, 2022).

[12] The sentence is comprised of fifty-five years for murder, enhanced by fifty-five years for the criminal organization finding, a consecutive term of thirty years for attempted murder, and three years for each criminal recklessness count, to be served concurrently with each other but consecutively to the murder and attempted murder sentences.

# No Reversible Error in the Admission of Evidence

[20] We apply an abuse-of-discretion standard to a trial court's decision about the admissibility of evidence and reverse only if the trial court's ruling is clearly against the logic and effect of the facts and circumstances and the error affects a party's substantial rights. *McCoy v. State*, 193 N.E.3d 387, 390 (Ind. 2022). Jackson contends the trial court abused its discretion in admitting five pieces of evidence offered by the State: text messages between Hegwood and Scruggs, Hegwood and Lane, Irvin and Perez, and Moody and his mother; and Moody's rap in written and spoken form.

### *Messages between Hegwood and Scruggs*

[21] Over Jackson's objection, the trial court admitted an exhibit containing text messages between Hegwood and Scruggs that were shared with Jackson and others as part of an Instagram group conversation. In the conversation, Scruggs wrote, "Duce a deadman on David," and then attached a screenshot from a text conversation with Hegwood in which Hegwood seems to threaten Jackson's daughter. *See supra* ¶ 7. Jackson objected to the evidence as hearsay. The State replied it was not hearsay because it was "in the nature of a threat to [Jackson's] daughter" and was thus a "verbal act" not a statement. *Tr. Vol. 3* at 218–19. The trial court admitted the messages, explaining: "[Hearsay] has to be an assertion, okay? . . . [S]o a threat is not a statement of fact it's a threat and so I think that falls outside of what normally would be considered an assertion[.]" *Id*. at 220.

[22]     "Hearsay" is a statement offered in evidence to prove the truth of the matter asserted. Ind. Evidence Rule 801(c)(2). In turn, a "statement" is defined, in part, as an oral or written assertion. Evid. R. 801(a). If the challenged statement does not assert a fact susceptible of being true or false, "it cannot be hearsay." *Craig v. State*, 630 N.E.2d 207, 211 (Ind. 1994). Further, if the statement is "offered to prove the fact of the utterance and not offered to prove the truth of the facts asserted, then there is no hearsay problem. . . . It is not hearsay at all." *Indianapolis Newspapers, Inc. v. Fields*, 259 N.E.2d 651, 674 (Ind. 1970); *see also United States v. Robinzine*, 80 F.3d 246, 252 (7th Cir. 1996) (noting challenged testimony was non-hearsay because the "significance of the words was *that* they were said (i.e., that a 'verbal act' occurred) . . ., not the truth-value of what was said").

[23]     Jackson contends the trial court abused its discretion in admitting these messages because "threats are hearsay when the threatening statement is being offered for the truth of the matter asserted." *Appellant's Br.* at 16. Although the general proposition that statements are hearsay when they are offered for the truth of the matter asserted is correct, Jackson does not analyze the threats contained in Hegwood's messages to show they were offered for that purpose.

[24]     To the contrary, these messages were not offered to prove the truth of Hegwood's statements but for their effect on Jackson and as an explanation of his subsequent conduct. Hegwood's statements contain no assertions of fact, and the messages were used to prove only that the statements were made and communicated to Jackson. *See Phillips v. State*, 25 N.E.3d 1284, 1288–89 (Ind.

Ct. App. 2015) (holding statements contained on warning labels attached to a crib were offered in the defendant's trial for reckless homicide to "establish what information was presented and available to [the defendant] . . . and her resultant state of mind" while caring for a child, and so the statements were not hearsay); *see also United States v. Thomas*, 86 F.3d 647, 654 n.12 (7th Cir. 1996) (noting evidence of threats to witnesses was "offered as the fact of an assertion and not as [an] assertion of fact" and were therefore not hearsay) (quoting *United States v. Garza*, 754 F.2d 1202, 1206 (5th Cir. 1985)), *cert. denied*.

[25] The trial court did not abuse its discretion in admitting these statements over Jackson's hearsay objection because they were not hearsay.

### *Messages between Hegwood and Lane; Irvin and Perez; and Moody and His Mother*

[26] Again over Jackson's hearsay objection, the trial court admitted three separate text message conversations as non-hearsay statements made by Jackson's co-conspirators during and in furtherance of a conspiracy pursuant to Indiana Evidence Rule 801(d)(2)(E).

[27] First, the State offered into evidence text messages that generally show Hegwood and Lane urging each other to share their location data in the two weeks before Hegwood's murder. Jackson objected, alleging the State had failed to show an agreement between Jackson and Lane to engage in criminal activity sufficient to allow admission of Lane's messages as a statement of a co-conspirator. The State countered that it had presented "extensive" testimony,

photos, and videos showing Jackson's "conspiracy associations" with Lane, Moody, and Perez. *Tr. Vol. 3* at 206. The trial court agreed with the State, finding a "prima facie foundation" for the admission of the messages as a statement of a co-conspirator in furtherance of a conspiracy. *Id.* at 207.

[28] Second, the State offered text messages in which Irvin tells Perez to follow Hegwood and Griffin thirty minutes before the shooting. The State offered these messages to explain Jackson, Lane, Moody, and Perez's movement to the Branches neighborhood in furtherance of the conspiracy. And the State asserted Irvin, although uncharged, was "part of this conspiracy." *Id.* at 233. The trial court accepted the State's assertion and admitted the messages.

[29] And third, the State offered text messages between Moody and his mother beginning about half an hour after the shooting in which Moody asks his mother to "have somebody come get This car." *Ex. Vol. 7* at 95. The investigation revealed the black car the shooters were driving in the Branches neighborhood was registered to Moody's mother. The court admitted the evidence as a statement by Moody in furtherance of the conspiracy—an attempt to dispose of or distance himself from the car used in the crime.

[30] Jackson claims the trial court abused its discretion in admitting these exhibits because it "permitted the State to open the floodgates of hearsay evidence under the simple assertion that there was a conspiracy" without requiring independent proof of an agreement between Jackson and the others to commit or attempt to commit murder. *Appellant's Br.* at 20. The State argues it sufficiently proved

"that each individual making the contested statements was involved in the conspiracy and made the statements in furtherance of the conspiracy or that the statement provided context for one of Jackson's co-conspirators." *Appellee's Br.* at 13. The State also argues some of the evidence was admissible for a purpose other than the truth of the matter asserted. Finally, the State argues if there was error, it was harmless.

[31] A statement made by a co-conspirator "during and in furtherance of the conspiracy" is not hearsay. Evid. R. 801(d)(2)(E). A statement is made during the conspiracy if it is "made between the beginning and ending of the conspiracy." *Houser v. State*, 661 N.E.2d 1213, 1219 (Ind. Ct. App. 1996), *trans. denied*. A statement is in furtherance of a conspiracy when it is "designed to promote or facilitate achievement of the goals of the ongoing conspiracy." *Leslie v. State*, 670 N.E.2d 898, 901 (Ind. Ct. App. 1996) (quoting *United States v. Tracy*, 12 F.3d 1186, 1196 (2nd Cir. 1993)), *trans. denied*.

[32] For a statement to be admitted under this rule, there must be independent evidence of a conspiracy; that is, the State must establish a conspiracy exists without using the statement at issue. *See Barber v. State*, 715 N.E.2d 848, 852 (Ind. 1999). If the trial court determines by a preponderance of the evidence that the declarant and the defendant were involved in a conspiracy and the statement was made during and in furtherance of that conspiracy, it is admissible "under the firmly-established co-conspirator exception[.]" *Wright v. State*, 690 N.E.2d 1098, 1105 (Ind. 1997). "[S]tatements that occur during the

course of and in furtherance of the conspiracy can take many forms[.]" *Id.* (internal quotation marks omitted).

[33] The existence of a conspiracy may be shown by direct or circumstantial evidence and "the evidence need not be strong." *Id.* The State does not have to prove the existence of an express formal agreement; "[i]t is sufficient if the minds of the parties meet understandingly to bring about an intelligent and deliberate agreement to commit the offense." *Porter v. State*, 715 N.E.2d 868, 870–71 (Ind. 1999) (quoting *Williams v. State*, 409 N.E.2d 571, 573 (Ind. 1980)). Evidence of a "mere relationship or association" with the alleged co-conspirator is insufficient standing alone to establish a conspiracy, but a conspiracy "may be inferred from acts of the parties in pursuance of an apparent criminal purpose they have in common." *Williams*, 409 N.E.2d at 573.

[34] Prior to offering any of the challenged statements as non-hearsay statements of a co-conspirator, the State presented testimony about typical gang behavior and the analysis of common "symbology," hashtags, and color schemes to identify "individuals [who] know each other, . . . relate with each other, . . . all hang out with each other." *Tr. Vol. 3* at 104. An IMPD intelligence analyst testified to his review of open sources of information—primarily Facebook and Instagram—to connect Jackson, Lane, Moody, Perez, McGrew, and Scruggs as "individuals [who] know each other, they frequent with each other, they are all associates of one another[,] . . . they're all involved in the same sort of enterprises together." *Tr. Vol. 3* at 126. The State had presented evidence about Lowery's death, the Fairgrounds shooting, and the ensuing feud between Davo

and KTG. Taunting videos and images shared by members of Davo directed at members of KTG and by Hegwood directed at Moody and Davo had been introduced into evidence. The State also showed Jackson had participated in the Davo Story and Alvarado music videos with Moody, McGrew, and Lane and communicated with Hegwood in the weeks before Hegwood's murder. And the State had introduced evidence connecting Moody with the black car driven by the shooters and offered a list of phone numbers found in Perez's house that included Moody's and Irvin's numbers.

[35] The bar for admitting a statement under Rule 801(d)(2)(E) is relatively low— the trial court only needs to determine the State has proved by a preponderance of the evidence the existence of a conspiracy between the declarant and the defendant[13] and that the statement was made during and in furtherance of this conspiracy. *Barber*, 715 N.E.2d at 852. Despite Jackson's argument to the contrary, by the time the challenged exhibits were offered, there was sufficient circumstantial evidence before the trial court to establish a common criminal purpose from which a conspiracy could be inferred between Jackson and the other identified Davo members directed at KTG members. Further, there was sufficient evidence the challenged statements were made during and in

---

[13] Our Supreme Court has observed that, like Federal Rule of Evidence 801(d)(2)(E), our rule "applies not only to conspiracies but also to joint ventures, and . . . a charge of criminal conspiracy is not required to invoke" the rule. *Francis v. State*, 758 N.E.2d 528, 533 n.5 (Ind. 2001) (quoting *United States v. Kelley*, 864 F.2d 569, 573 (7th Cir. 1989), *cert. denied*).

furtherance of the conspiracy. The statements by Lane, Perez, and Moody were admissible as non-hearsay statements by co-conspirators.

[36] To the extent Irvin's participation in the conspiracy is tenuous without considering the challenged evidence, we agree with the State that the pertinent message—"follow them it's only duce an victor"—was not hearsay. "Follow them" is a command with no factual content and therefore is not hearsay as it is not an assertion of fact capable of being true or false. *See Powell v. State*, 714 N.E.2d 624, 628 (Ind. 1999) (stating commands or questions with no factual content "clearly are not assertions"). And the rest of the statement was not offered for the truth of the matter asserted—that Hegwood and Griffin were alone in a car—but to explain why Jackson and the others went to the Branches neighborhood that fateful day. Thus, even if the messages between Perez and Irvin should not have been admitted as statements of co-conspirators, the trial court did not err in admitting them.

[37] As for the texts between Moody and his mother, the State did not assert at trial nor does it allege on appeal that Moody's mother was part of the conspiracy such that her statements would be admissible under Rule 801(d)(2)(E). Instead, the State argues her part of the conversation was not admitted for the truth of the matters asserted, but only to provide context for Moody's statements, which were properly admitted. Statements that provide context for other admissible statements are not hearsay because they are not offered for their truth. *Williams v. State*, 930 N.E.2d 602, 609 (Ind. Ct. App. 2010), *trans. denied*. In addressing the admission of conversations between a defendant and a confidential

informant over a hearsay objection, our Supreme Court observed the informant's statements were not hearsay because the informant's side of the conversation was not admitted for the truth of the matters asserted—"[i]t was the statements made by [the defendant] that really constituted the evidentiary weight of the conversation." *Williams v. State*, 669 N.E.2d 956, 958 (Ind. 1996). Here, too, it was the statements by Moody about the car that carry the evidentiary weight in those messages, and his mother's contributions to the conversation merely placed Moody's statements in context.

[38] But even if the trial court erred in admitting any of these three sets of messages, Jackson would not be entitled to reversal of his convictions on that basis. Appellate Rule 66(A) states:

> No error or defect in any ruling or order or in anything done or omitted by the trial court . . . is ground for granting relief or reversal on appeal where its probable impact, in light of all the evidence in the case, is sufficiently minor so as not to affect the substantial rights of the parties.

"[T]he party seeking relief bears the burden of demonstrating how, in light of all the evidence in the case, the error's probable impact undermines confidence in the outcome of the proceeding below." *Hayko v. State*, 211 N.E.3d 483, 492 (Ind. 2023).

[39] Here, the challenged evidence does not directly implicate Jackson in the shooting. Although the messages help to explain the course of the Davo group's conduct in general, Jackson is not specifically mentioned in any of the

text messages between Lane and Hegwood, between Irvin and Perez, or between Moody and his mother. Over the course of a five-day trial with nearly 200 exhibits, the State presented ample other evidence connecting Jackson to the shooting. The "basic premise" of harmless error is that "a conviction may stand when the error had no bearing on the outcome of the case." *Durden v. State*, 99 N.E.3d 645, 652 (Ind. 2018). Because none of the pieces of challenged evidence, individually or cumulatively, had a direct bearing on Jackson's guilt or innocence, the probable impact of these three exhibits on the jury was sufficiently minor as to not affect his substantial rights, and Jackson does not argue otherwise. If the admission of any of the exhibits was erroneous, it was harmless error.

### Moody's rap song

[40] Finally, the trial court admitted rap lyrics written and performed by Moody as statements of a co-conspirator over Jackson's hearsay objection. Jackson alleges the trial court erred because there was no evidence the lyrics were written "in furtherance of a conspiracy to commit a crime already completed such that this evidence was not hearsay" or that Jackson was involved with the song's creation or knew about the song. *Appellant's Br.* at 21.

[41] As discussed above, the State had sufficiently established a conspiracy existed between Jackson and Moody. Yet, to admit a statement pursuant to Rule 801(d)(2)(E), the statement must also be made during and in furtherance of the conspiracy. A statement is in furtherance of a conspiracy when it is "designed to promote or facilitate achievement of the goals of the ongoing conspiracy."

*Leslie*, 670 N.E.2d at 901. Generally, statements that are in furtherance of a conspiracy are intended to "set in motion transactions that [are] an integral part" of the conspiracy, *United States v. Fielding*, 645 F.2d 719, 726 (9th Cir. 1981) (quotation omitted), obtain the confidence or allay the suspicions of a co-conspirator, *United States v. Miller*, 664 F.2d 94, 98 (5th Cir. 1981), *cert. denied*, or induce another to join, cooperate, or assist the conspiracy, *see Williams v. State*, 815 S.W.2d 743, 745–46 (Tex. App. 1991) (collecting federal cases on the "in furtherance of" requirement).[14] Statements which are "puffing" or mere boasts are not in furtherance of a conspiracy unless they are used for one of those purposes. *See Miller*, 664 F.2d at 98. Likewise, statements that "represent 'mere idle chatter' or which are mere narratives of past conduct are not in furtherance of the conspiracy[.]" *United States v. Cornett*, 195 F.3d 776, 783 (5th Cir. 1999); *see* 2 Wharton's Criminal Evidence § 6:18 (15th ed.) ("Statements consisting of narratives of past activities or statements that are mere 'puffing' or 'idle chatter' are not in furtherance of the conspiracy and should not be admitted.").

[42] Moody's rap should not have been admitted under Rule 801(d)(2)(E) because it was not a statement made in furtherance of the conspiracy. One, the video and the written lyrics were both found on Moody's cellphone and there is no evidence the rap was shared with anyone. For that reason alone, it could not

---

[14] Our Supreme Court has observed Indiana Evidence Rule 801(d)(2)(E) is a "mirror image" of Federal Evidence Rule 801(d)(2)(E) and therefore, "it is appropriate for us to consider and rely upon" cases from other jurisdictions interpreting the same rule. *Wright*, 690 N.E.2d at 1105 n.7 (Ind. 1997) (citing *Yamobi v. State*, 672 N.E.2d 1344, 1347 & n.4 (Ind. 1996)).

have furthered the conspiracy because it was not an apparent attempt to induce anyone to participate in the conspiracy, provide information or directions for carrying it out, or obtain anyone's confidence. And two, the rap is at most a boast and/or a narrative about past activities. Although not specifically referencing Moody's rap, an IMPD intelligence analyst testified it was common for gang members to make songs claiming responsibility for crimes as "almost a notoriety kind of like a boastful attitude." *Tr. Vol. 3* at 106. Such is the case here. Although the rap could have been admitted in a criminal trial of Moody, it was an abuse of discretion for the trial court to admit it in Jackson's trial.

[43] However, as above, any error in admitting the written and spoken lyrics was harmless because the rap, to the extent it is intended to claim responsibility for the shooting, does not implicate Jackson. Thus, the probable impact of this evidence on the jury in Jackson's trial was sufficiently minor as to not affect his substantial rights, and again, Jackson does not argue otherwise.

## Jackson's Convictions are Supported by Sufficient Evidence

[44] A sufficiency-of-the-evidence claim warrants a "deferential standard of appellate review, in which we 'neither reweigh the evidence nor judge witness credibility[.]'" *Owen v. State*, 210 N.E.3d 256, 264 (Ind. 2023) (quoting *Brantley v. State*, 91 N.E.3d 566, 570 (Ind. 2018), *cert. denied*). Those matters are reserved to the province of the jury. *Brantley*, 91 N.E.3d at 570. We consider "only probative evidence and reasonable inferences that support the judgment of the trier of fact" and will affirm the conviction "unless no reasonable fact-finder

could find the elements of the crime proven beyond a reasonable doubt." *Hall v. State*, 177 N.E.3d 1183, 1191 (Ind. 2021). It is "not necessary that the evidence 'overcome every reasonable hypothesis of innocence.'" *Drane v. State*, 867 N.E.2d 144, 147 (Ind. 2007) (quoting *Moore v. State*, 652 N.E.2d 53, 55 (Ind. 1995)).

## Murder

[45] Jackson was charged with Hegwood's murder under a theory of accomplice liability. The accomplice liability statute permits a defendant to be found guilty as an accomplice without proof the defendant committed every element of the crime when the defendant "knowingly or intentionally aids, induces, or causes another person to commit an offense." I.C. § 35-41-2-4. "There is no bright line rule in determining accomplice liability; the particular facts and circumstances of each case determine whether a person was an accomplice." *Vitek v. State*, 750 N.E.2d 346, 353 (Ind. 2001).

[46] We consider four factors to determine whether a defendant acted as an accomplice: "(1) presence at the scene of the crime; (2) companionship with another engaged in criminal activity; (3) failure to oppose the crime; and (4) a defendant's conduct before, during, and after the occurrence of the crime." *Garland v. State*, 788 N.E.2d 425, 431 (Ind. 2003). A defendant's mere presence is not enough to show participation in the commission of a crime, but presence may be considered along with the other factors tending to show participation. *Grinstead v. State*, 845 N.E.2d 1027, 1036 (Ind. 2006). Jackson contends the State proved only that he was present during the commission of the crime,

which he argues is insufficient to support his conviction as an accomplice to murder.

[47] The evidence most favorable to a conviction shows Jackson was involved with other members of the Davo gang in an ongoing dispute with Hegwood and KTG members. He attempted multiple times in the month before the murder to learn Hegwood's location and was asked the day before the shooting, "U still tryn Shoot?" *Ex. Vol. 6* at 238. Jackson was armed and with Davo gang members including Lane, Moody, and Perez twelve hours before the shooting, was in the car used in the shooting at some point; and—according to cell phone data—was present in the Branches neighborhood at the time of the shooting, in close proximity to Moody and Lane. Griffin told police after the shooting there were four black males in the car from which the shots were fired. Multiple bullets fired from more than one weapon were found at the scene, including bullets from the caliber gun Jackson was recorded holding just hours before the shooting. Far from opposing the crime, Jackson was an active participant in the events leading up to it and continued to associate with Davo members after the crime, following them to California.

[48] Thus, Jackson was present at the scene of the crime; an abundance of evidence shows Jackson's companionship with other members of the Davo gang; nothing suggests Jackson opposed shooting Hegwood; and Jackson's participation before, presence during, and actions after the crime all tend to show his complicity. Based on this evidence, the jury could have concluded beyond a reasonable doubt that Jackson, Lane, Moody, and Perez were present at the

crime scene and Jackson was at least an accomplice to Hegwood's murder. Jackson's argument is essentially a request that we reweigh the evidence in his favor, a request we will not grant. *See Owen*, 210 N.E.3d at 264. The evidence and inferences favoring the verdict here are sufficient to support Jackson's conviction.

### *Attempted Murder*

[49]     Jackson was also charged with aiding, inducing, or causing the attempted murder of Griffin. The crime of attempted murder is subject to a special rule: "[a] conviction for attempted murder requires proof of a specific intent to kill." *Henley v. State*, 881 N.E.2d 639, 652 (Ind. 2008); *see Rosales v. State*, 23 N.E.3d 8, 12 (Ind. 2015) (explaining attempted murder is "singled out . . . for special treatment" because of "the stringent penalties for attempted murder and the ambiguity often involved in its proof") (quoting *Hopkins v. State*, 759 N.E.2d 633, 637 (Ind. 2001)). To convict a defendant of aiding an attempted murder, the State must prove:

> (1) that the [principal], acting with the specific intent to kill, took a substantial step toward the commission of murder, and (2) that the defendant, acting with the specific intent that the killing occur, knowingly or intentionally aided, induced, or caused the [principal] to commit the crime of attempted murder.

*Bethel v. State*, 730 N.E.2d 1242, 1246 (Ind. 2000). Mere presence during the commission of the crime is insufficient under a theory of accomplice liability. *Ellis v. State*, 67 N.E.3d 643, 650 (Ind. 2017). Jackson contends the State failed

to present any evidence he had the specific intent for Griffin to be killed or aided, induced, or caused anyone to attempt to kill Griffin.

[50] On the day an IMG member was shot at the fairgrounds, Griffin was found in possession of firearms near that location. Griffin was a target of some of the Davo gang's harassment prior to the shooting—McGrew posted a picture of himself and Lane holding firearms in Griffin's driveway and Jackson shared a video from the same location. When the Davo gang went to the Branches neighborhood on December 15, they believed Hegwood and Griffin were together—Irvin had told Perez "it's only duce an victor" one-half hour before the shooting and Hegwood had recently recorded a live video showing Griffin in the car with him. A reasonable inference is that when Jackson, Lane, Moody, and Perez went to the Branches neighborhood and opened fire on Hegwood's vehicle, they each had the specific intent to kill both occupants and each aided the others in the attempt to do so. Although Griffin was not hit by gunfire, a bullet went through the hood of his sweatshirt and damaged the headrest of his seat. The deliberate firing of a gun in the direction of an individual is substantial evidence from which a jury may infer intent to kill. *Henley*, 881 N.E.2d at 652. Again, Jackson's argument is essentially a request that we reweigh the evidence, and again, we decline to grant that request. The evidence and reasonable inferences from the evidence support the jury's verdict.

## Conclusion

[51] The trial court did not commit reversible error in admitting several exhibits over Jackson's hearsay objection and sufficient evidence supports Jackson's

convictions of murder and attempted murder. Accordingly, Jackson's convictions are affirmed.

Affirmed.

Altice, C.J., and Vaidik, J., concur.